## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DARIOUSH RADMANESH,           )
                             )

     c/o MARC C. LENAHAN       )
     LENAHAN LAW FIRM P.L.L.C.  )
     2655 VILLA CREEK, SUITE 204  )
     DALLAS, TEXAS, 75234,      )
                             )

     PLAINTIFF,              )
                             )

V.                            )
                             )

THE ISLAMIC REPUBLIC OF IRAN,  )
                             )

     c/o Ministry of Foreign     )     CIVIL ACTION NO: 1:17-CV-1708
     Affairs                   )
     Khomeini Avenue        )
     United Nations Street     )
     Tehran, Iran           )
                             )

AND                          )
                             )

THE IRANIAN REVOLUTIONARY  )
GUARD CORPS,             )
                             )

     Pasdaran Avenue        )
     Golestan Yekom         )
     Tehran, Iran,          )
                             )

     DEFENDANTS.         )

---

## COMPLAINT

---

## I.  PROCEDURAL INTENT

1.1    Plaintiff Radmanesh brings this action against *The Islamic Republic of Iran* and *The Iranian Revolutionary Guards Corps*, jointly and severally, pursuant to the FOREIGN SOVEREIGN IMMUNITIES ACT, 28 U.S.C. § 1602, *et seq*., for severe personal injuries and other irreparable harm suffered as a result of Defendants' unlawful acts of terrorism, torture, hostage-taking, and other torts.

1.2.    As the Defendants are not expected to participate in this case, Plaintiff intends to seek a Final Judgment via Default.

1.3.    A Final Judgment is a prerequisite to application to the *U.S. Victims of State Sponsored Terrorism Fund* (the "Fund") pursuant to the THE JUSTICE FOR UNITED STATES VICTIMS OF STATE SPONSORED TERRORISM ACT, 42 U.S.C. § 10609.

1.4.    The Fund is administered by Mr. Kenneth R. Feinberg as Special Master, and provides for compensation to certain U.S. persons who were injured in acts of international, state-sponsored terrorism.

## II.  JURISDICTION AND VENUE

2.1.    This Court has jurisdiction pursuant to 28 U.S.C. § 1330(a), 1331, and 1605A.

2.2.    Venue in this Court is proper in accordance with 28 U.S.C. § 1391(f)(4) which provides that a civil action against a foreign state may be brought in the United States District Court for the District of Columbia.

### III.  PARTIES

3.1.  **Plaintiff Darius Radmanesh** is a Missouri-born child of a United States citizen. Plaintiff has been a national of the United States, as defined under 28 U.S.C. § 1605A(h)(6), throughout his life.

3.2.  **Defendant Islamic Republic of Iran** (hereinafter, **"Defendant Iran"**) is a foreign sovereign that has been designated, and remains designated, *a state sponsor of terrorism* pursuant to Section 6(j) of the EXPORT ADMINISTRATION ACT OF 1979 (50 U.S.C. Appx. § 2405(j)), Section 40 of the ARMS EXPORT CONTROL ACT (22 U.S.C. § 2780), and Section 620A of the FOREIGN ASSISTANCE ACT OF 1961 (22 U.S.C. § 2371).  *See also* 49 Fed.Reg. 2836 (Jan. 23, 1984); *State Sponsors of Terrorism*, U.S. Dept. of State, https://www.state.gov/j/ct/list/c14151.htm (2017). This Court has acknowledged that Defendant Iran "has been aware of the United States policy condemning international terrorism at least since the 1979-1981 hostage crisis in Tehran." *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 14 (D.D.C. 1998).

3.3.  This Court recognizes **Defendant Iranian Revolutionary Guard Corps** (hereinafter, "**Defendant IRGC**") as a governmental division of the Defendant Iran.  *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 199 (D.D.C. 2008).  This Court has held that the IRGC is the functional equivalent of Iran, thus qualifying as a "foreign state" as that term is defined by the FSIA.  Cohen v. Islamic Republic of Iran, 12-CV-01496 (CRC) — F. Supp. 3d __, 2017 WL 818208, at *5 (D.D.C. March 1, 2017).  The Court has held that the Defendant IRGC, "appears to be the true 'instrumentality' of the dominant party of the state [of Iran], used by the government and its officials in largely 'illegal,' paramilitary, and *sub rosa* activities to supplement

the goals of its official agencies and foreign policy needs." *Holland v. Islamic Republic of Iran*, 496 F. Supp. 2d 1, 32 (D.D.C. 2005).  Defendant IRGC is the governmental division of Defendant Iran through which it caused, supported, and contributed to the terrorists acts that resulted in hostage-taking, torture, and other injuries to Plaintiff as alleged herein.

## IV.  STATEMENTS OF FACT

### A.  FROM MISSOURI TO IRAN

4.1.    Born in Kirksville, Missouri, in 1969, Plaintiff has always been, and continues to be, a citizen and national of the United States.  His mother, the late Linda McKim, was also a United States citizen and a native of Kirksville.   Plaintiff's mother met and married Plaintiff's then-future father while he was an Iranian exchange student at Northeast Missouri State University (now known as Truman State University) in Kirksville, Missouri.  Plaintiff was born, raised, and remains a devout Christian during all of his life, the acute relevancy of which is addressed *infra*.

4.2.    In 1975, a still very young Plaintiff moved with his family to South Carolina so that his father could receive job-specific training to work as an engineer for Polyacryl Iran ("Polyacryal"), a unit of the American company DuPont which was establishing branches in Iran.

4.3.    In 1978, after his father's training was complete, the Radmanesh family moved to the Mardavige neighborhood in Isfahan, Iran, where his father began working at Polyacryl in the position for which he had trained in South Carolina.   Plaintiff was enrolled in the American School in Iran so that he could continue his education, receiving instruction in English and learning in a Christian-friendly environment.

4.4.    For the next several months, violence in the city grew sharply as anti-American and anti-Shah forces rapidly gained power.  As anti-American sentiments rose, many Americans fled Iran in the wake of the impending theocracy.  This exodus resulted in the closure of numerous engineering and manufacturing businesses in Iran.  Polyacryl was among the facilities shuttered during this time.  In 1979, the Shah of Iran was overthrown in what is now referred to as the "Iranian Revolution."

**B.    TAKEN HOSTAGE**

4.5.    The then 10-year old Plaintiff and his family, like the other families who had come from America to work at Polycryl, were intent on fleeing Iran.  Their plans for escape, however, were abruptly halted by Defendant IRGC on November 5, 1979, *the day after the hostages were taken* at the United States Embassy in Tehran.

4.6.    On this day, multiple soldiers of Defendant IRGC appeared at Plaintiff's home with machine guns and accused Plaintiff's father of being an American agent and traitor to Iran. When Plaintiff's father tried to respond, an IRGC soldier hit him in the face, shouted at him, and told him to shut-up or they would shoot and kill the entire family on the spot.  Plaintiff's father told the soldiers that he would do whatever they wanted if they would allow his family to return to the United States.   The soldiers told the family that they "were not going anywhere." Defendant IRGC then took Plaintiff's father from the family home.

4.7.    Two days later, Defendant IRGC returned to the Radmanesh home with Plaintiff's father and proclaimed that he had been found *Guilty of Treason* against Iran and its leader, Khomeini. Plaintiff and his family were told that they would be executed as spies *unless* (1) they remained in

Iran, and (2) Plaintiff's father trained Iranian citizens to be engineers capable of operating and maintaining the then shuttered, and soon to be nationalized, factories.   Because the American engineers had fled the country, Defendants were in need of someone to provide instruction so that the factories could become operational.   This forced *quid pro quo* saved the lives of the Radmanesh family, but required that they remain in Iran.

## C.   TORTURED

4.8.   As noted in the *Congressional Record*, Defendants detained Plaintiff as a hostage for the following seven years (159 CONG. REC. E1319 (*daily ed.*, Sept. 17, 2013)(statement of Rep. Graves)).   During this period, Plaintiff was subjected to countless incidents of physical and psychological torture, in addition to false imprisonment, as described herein.   The majority of these events took place in Iran while it was under siege by Iraq:   from September 22, 1980, through the time of Plaintiff's escape.

4.9.   With the closing of the American School at which he previously studied, Plaintiff was coerced into the Iranian-run, anti-American, school system.   He was the only American at a school that promoted the concept of "Death to all Americans" in its daily curriculum.   The Iranian-run school system placed great importance on the teachings of the *Holy Koran* and loyalty to Khomeini.   It considered Arabic — the language of the *Holy Koran* — and Farsi to be paramount subjects.   Despite his age and academic accomplishments at the American School, Plaintiff was pushed-back to first grade because, as a Christian American, he was deemed insufficiently proficient in Arabic or Farsi.

4.10.   Plaintiff was often pushed to the ground, spat upon, and then kicked by the Iranian students while they chanted "Death to Americans."  On occasion, Plaintiff could see the school principal watching and laughing as Plaintiff was being attacked.

4.11.   Over time, the violence perpetrated upon Plaintiff became even more intense.  A cadre of young members of the IRGC Basaji — a youth paramilitary organization operating under Defendant IRGC — began to corner Plaintiff on his way home from school to abuse him. Often, the perpetrators shouted "American bastard!" and "Yankee, get the hell out of our country!" while physically attacking Plaintiff.   Sometimes, the young IRGC Basaji members would drench him in showers of urine while he lay helpless on the ground.   On one occasion, they punched Plaintiff in the face, knocked him to the ground, and kicked him all over his body so violently that Plaintiff required hospitalization for his injuries.   Plaintiff sustained multiple cracked ribs (which never healed correctly), contusions all over his body, lacerations, and a concussion.   Further, his disc protrusions from C2-3 to C5-6, resulting in on-going numbness in his left hand and mechanical issues with his neck and back, are likely attributable to the beatings.

4.12.   Plaintiff was also constantly surrounded by, and exposed to, violence on the streets around him.   By way of example, at the age of 13, while shopping for groceries with his mother, Plaintiff witnessed a naked, pregnant women being stoned to death.   Once the lifeless body of the woman lay in the street, a guard of Defendant IRGC walked over to her and, in accordance with Sharia law, struck her three times in the head with a shovel to make sure she was dead.

4.13.   Plaintiff witnessed the routine mocking and cursing of his mother and, on occasion, her beating by Defendant IRGC because of her United States citizenship and her Christian faith.  *See*

159 Cong. Rec. E1319 (*daily ed.*, Sept. 17, 2013)(statement of Rep. Graves).

4.14.   When Plaintiff was fifteen, he was expelled from the Iranian School system after refusing to step on an American flag that had been newly painted on the floor of the entranceway to his school so that students would tread on it.   The principal admonished Plaintiff that his refusal to step on the American flag was an open defiance against Iran and an offense against Iran's Supreme Leader, Ayatollah Khomeini.

4.15.   Having been expelled and marked for refusing to step on the American flag, Plaintiff's risk of suffering retribution by Defendant IRGC was greatly exacerbated.   Hoping to be sequestered from further danger, Plaintiff secured an apprenticeship at a machine shop in the small industrial town of Shaheen-Shahr.

4.16.   On August 11, 1986, while behind a lathe machine with his supervisor, Plaintiff observed the silhouette of an Iraqi MiG as it flew over the factory's glass roof.   The entire ceiling exploded, sending shards of glass through the air, and slicing the faces and arms of many of his co-workers. Plaintiff fell between two large boxes of spare parts, severely cutting the right side of his back.

4.17.   Once outside, he watched as several Iraqi jets flew to the neighboring Isfahan oil refinery and began firing rockets until the refinery exploded.   *See* UPI Chronology of Persian Gulf War, http://www.upi.com/Archives/1988/08/20/Chronology-of-Persian-Gulf-War-1980/5551588052800/ (August 20, 1988).   The MiG's came back around and began strafing.   A second wave of MiG's appeared and joined in the attack.   The Iranian anti-aircraft batteries arrived and began firing.

4.18.   When the battle subsided, Plaintiff learned that some of his co-workers had perished in the attack that made clear that the Iranian industrial complexes were now targets for Iraqi air attacks.  With his apprenticeship located beside an ammunitions factory, Plaintiff quit his job.

**D.     FALSELY IMPRISONED, THEN FORCED TO FIGHT**

4.19.   On or about September of 1986, a little over a month after surviving the Iraqi air raid, the then sixteen-year-old Plaintiff was outside in his neighborhood when he was grabbed by the neck, dragged into a truck, and transported through the desert by Defendant IRGC.  When the truck stopped, it deposited Plaintiff on an Iranian military base where he was told that he was now a soldier fighting in the Iran-Iraq war, known in Iran as the "Holy Defense."  Plaintiff had no means of contacting his family to let them know he had been taken prisoner by Defendant IRGC.  He was sixteen, American, and a Christian forced to fight in the Holy Defense.

4.20.   His military ordeal began the day after his arrival on the base.  His head was shaved, and he was forced to run for hours in the desert and its extreme heat.  Though he had never handled a firearm before, after one week, he was given an AK-47 and a Colt-45 handgun.  He was also forced to undergo training on RPG-7 Russian bazookas, hand-to-hand combat, knife-fighting, and skills including how to stealthily approach enemy soldiers to strangle them with wire.  Plaintiff was prohibited from contacting his family.

4.21.   After a month of training, Plaintiff was transferred to a military base located a few miles behind the battlefield, near Khoram Shahr, a city close to the Iraqi border.  Plaintiff was allowed one phone call to tell his family good-bye.

4.22.    There, he and other similarly-aged soldiers were assigned to the artillery unit to load cannons though they had no training or instruction in artillery.   On his first day of battle, some of the others from his training unit were killed.   One lost his head when an Iraqi artillery shell exploded near the trench where Plaintiff had taken cover.  Many of the others in his training unit were severely injured.

4.23.    Plaintiff was almost killed many times.   Once, while digging a trench, Plaintiff stepped away from the trench only moments before it was hit by an Iraqi artillery shell.   Knowing that there were two other soldiers in the trench, Plaintiff ran over and saw them both half-buried, lying dead in the bottom of what was now a massive crater.

4.24.    Plaintiff was regularly told to rush the enemy and that he would be rewarded by Allah when killed.   He, and the other peer soldiers, were given small golden keys so that they would be able to unlock the gates of heaven upon Martyrdom.

4.25.    He was forced to attack through large minefields surrounded by elaborate configurations of razor wire.   During these raids, Plaintiff was on the battlefield with masses of children — ages nine through eleven — who were being used by Defendant IRGC as human minesweepers.   Not only did he witness these children stepping on and being killed by the mines, he was forced to climb through their dismembered and disemboweled bodies to make his way around the lines of battle.   Plaintiff was continually surrounded by bodies of adults and children so badly injured that their remains were unrecognizable.

4.26.    He began smoking during this period, and remains a chain-smoker today.

4.27.   After managing to survive all assignments given to him, he was pulled aside by his commander and told that he was going to be sent to death on a new assignment so that the Khomeini government could proclaim him as an American Martyr for Islam.

4.28.   He was assigned to a new unit, helicoptered twenty miles into Iraqi territory, and surrounded by C4 plastic explosives for the purposes of blowing-up an Iraqi ammunition depot. It was during this mission that he was forced by his commander, at gunpoint, to shoot a sleeping Iraqi soldier in the head at point blank range.   This event still recurs in his dreams and continuing flashbacks.

4.29.   Plaintiff survived the ammunitions assignment, and was then stationed back on the front lines.  On his final day in battle, after being engaged in both a sniper and an artillery shell attack, Defendant IRGC soldiers found Plaintiff lying in a trench in a delirious state.   He was transported to a hospital where doctors determined he had suffered a severe nervous breakdown, diagnosing him with post-traumatic stress syndrome.  On or about December 20, 1986, Plaintiff was sent back to his home for a two-week leave in order to recuperate.

4.30.   After arriving home for his two-week leave, Plaintiff's family paid smugglers who arranged to keep Plaintiff in hiding until he could be taken out of the country.

4.31.   He absconded with the smugglers before Defendant IRGC returned to force him back onto the battlefield.  He spent the following months in hiding at various locations within Iran.

4.32.   He was ultimately smuggled out of Iran on a cargo ship destined for Dubai.

4.33.   Upon arriving in Dubai, Plaintiff was taken to the U.S. State Department at the American Consulate where Vice Consul Michael J. Varga worked to ensure his safe return to the

United States.   Plaintiff's mother had been able to escape Iran during the prior year, and had informed the United States Embassy of her son's situation.   Consequently, the Vice Consul was able to locate Plaintiff's passport number through the Swiss Embassy and the United States provided the funding to return Plaintiff to his mother's home in Missouri.

4.34.   His next six years were plagued by severe post-traumatic disorder syndrome ("PTSD"). Initially, he could not bring himself to leave his room, preferring to stay in the dark with the blinds closed.   He was unable to attend school or keep a job for any meaningful length of time. He sought treatment from psychologists and psychiatrists to help him manage his flashbacks, panic attacks, nightmares, tremors, and insomnia.   He suffered two mental breakdowns.   Today, Plaintiff continues to suffer from flashbacks, nightmares, and severe sleep issues.    He also continues to suffer from panic attacks which are often triggered by loud sounds, including thunder and the sound of honking horns.

4.35.   Likewise, Plaintiff continues to suffer from dizziness, numbness in his left hand, back pain, ribs that dislocate when he reclines in certain positions or lifts weight, and spasms in his neck that feel like knives slicing him.

## V.  PRIVATE RIGHTS OF ACTION FOR
## PERSONAL INJURIES CAUSED BY
## HOSTAGE-TAKING AND TORTURE
## UNDER 28 U.S.C. § 1605A(c)

5.1.   Plaintiff incorporates each and every allegation set forth above.

5.2.   The *terrorism exception* to the jurisdictional immunity of a foreign state, codified at 28

U.S.C. § 1605A ("FSIA"), provides a right of action against the Defendants for personal injuries caused by acts of torture and hostage taking.

5.3.    Section 1605A applies if three conditions are met:

(a)    The foreign state is designated a state sponsor of terrorism;

(b)    The claimant or victim was a national of the United States at the time of the act of terrorism; and

(c)    In cases where the act of terrorism occurred in the foreign state against whom suit has been brought, the foreign state was afforded a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration.  *See Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 326 (D.D.C. 2014).

5.4.    Each of these conditions has been satisfied:

(a)    Defendant Iran was, and remains, a "state sponsor of terrorism" as that term is defined in 28 U.S.C. § 1605A(a)(2)(A)(i).  Section 6(j) of the EXPORT ADMINISTRATION ACT of 1979 (50 U.S.C. Appx. § 2405(j)); Section 40 of the ARMS EXPORT CONTROL ACT (22 U.S.C. § 2780); Section 620A of the FOREIGN ASSISTANCE ACT OF 1961 (22 U.S.C. § 2371); 49 *Fed.Reg.* 2836 (Jan. 23, 1984); *State Sponsors of Terrorism*, U.S. Dept. of State, https://www.state.gov/j/ct/list/c14151.htm (2017).   Further, this Court has repeatedly held that Defendant IRGC is a governmental entity and a part of the state of Iran itself.  *See, e.g., Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 61 (D.D.C. 2006); *Salazar v. Islamic Republic of Iran*, 370 F.  Supp. 2d 105, 117 (D.D.C. 2005) ("[I]n its primarily military function and close association with [the Ministry of the Islamic State], the IRGC is more like an 'armed force' under the ultimate command of the

leadership of the Iranian government (if not its political functionaries), than like a commercial agency or instrumentality of the state.")

(b)     A Missouri-born son of an American mother, Plaintiff has always been, and continues to be, a United States citizen.

(c)     Plaintiff satisfies the FSIA requirement concerning arbitration by including an offer of arbitration with the documents served upon Defendants.  *See Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 233 (D.C. Cir. 2003)(holding that an offer to arbitrate received by Defendant Foreign state, prior to its response to the Complaint, is sufficient to qualify as a reasonable opportunity to arbitrate).

5.5.    Further, Plaintiff is entitled to bring this private right of action against the Defendants, under 28 U.S.C. § 1605A(c), which requires that Plaintiff prove:

"(1) 'an act of torture, extrajudicial killing, aircraft sabotage, hostage-taking, or the provision of material support or resources for such an act' where (2) the act was committed, or the material support was provided, by the foreign state or agent of the foreign state, and the act (3) caused personal injury or death (4) 'for which courts of the United States may maintain jurisdiction under this section for money damages.'"

*Worley*, 75 F. Supp 3d at 332, *citing to* 28 U.S.C. § 1605A(c).

5.6.    Defendant Iran, in committing the acts alleged herein — and through its governmental subdivision, Defendant IRGC — planned and carried out the hostage-taking, torture, intentional infliction of emotional distress, assault, battery, and false imprisonment of Plaintiff Darioush Radmanesh in Iran and Iraq that began on or about November 5, 1979, and continued for over

seven years until he was ultimately smuggled into hiding.

5.7. As a direct and proximate result of the Defendants' conduct, Plaintiff is entitled to the compensatory and exemplary damages described herein.

5.8. The consequences of Defendants' conduct were reasonably certain to occur. *See, e.g., Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 82 (D.D.C. 2017).

5.9. The Defendants are, therefore, jointly and severally liable under 28 U.S.C. § 1605A(c) for the full amount of damages sought by Plaintiff.

## A.   COUNT  I — HOSTAGE-TAKING

5.10. Plaintiff incorporates each and every allegation set forth above.

5.11. The term "hostage-taking," as referenced in the FSIA, is defined under the Article 1 of the *International Convention Against the Taking of Hostages* as follows:

1. Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person ("hereinafter referred to as the "hostage") in order to compel a third party … to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offense of taking of hostages ("hostage-taking") ….

2. Any person who: [ ]

   (b) Participates as an accomplice of anyone who commits or attempts to commit an act of hostage taking likewise commits an offense ….

5.12. Commencing in November of 1979, Defendants intentionally and willfully detained Plaintiff and continued to detain Plaintiff until he escaped into hiding in December of 1986.

5.13.    Defendants detained Plaintiff in order to compel and coerce Plaintiff's father to work for the Iranian government.  Iran was in need of someone with the requisite expertise necessary to train Iranian citizens to be capable of operating and maintaining the shuttered factories the government intended to nationalize.

5.14.    By reason of Defendants' acts in detaining Plaintiff, he suffered damages including, but not limited to, loss of liberty, bodily injury, severe emotional distress, pain and suffering and economic damages.

**B.      COUNT II — TORTURE**

5.15.    Plaintiff incorporates each and every allegation set forth above.

5.16.    Section 1605(a)(7) of the FSIA creates a federal cause of action for torture, or provision of material support for torture, of American nationals, or for the benefit of American national claimants, when such acts are committed by a foreign state designated as a state sponsor of terrorism and as otherwise defined by that section.

5.17.    The term "torture," as referenced under the FSIA, is defined in Section 3 of the TORTURE VICTIM PROTECTION ACT OF 1991, as follows:

> (b)      Torture. — For the purposes of this Act —
>
> (1)      the term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering … whether physical or mental, is intentionally inflicted on that individual for such purposes as … punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third

person, or for any reason based upon discrimination of any kind; and

> (2)     mental pain or suffering refers to prolonged mental harm caused by or
resulting from —

>> (A)     the intentional infliction or threatened infliction of severe
physical pain or suffering; [ ]

>> (C)     the threat of imminent death ….

5.18.   For over seven years, Defendants repeatedly punished Plaintiff for being an American citizen, for his Christian beliefs, for his refusal to denounce his American heritage and Christian faith, and for the political stance the United States took toward the Iranian regime after the Iranian Revolution.   Furthermore, because of his nationality and religion, he was intimidated and coerced by Defendant IRGC to fight with the Iranian Military during the Iran-Iraq war, known to the Iranians as the "Holy Defense."

5.19.   By reason of Defendants' acts in torturing him, Plaintiff suffered damages including, but not limited to, loss of liberty, bodily injury, severe emotional distress, pain and suffering, and economic damages.   Plaintiff continues to suffer from physical and psychological injuries resulting from Defendants' torture.

## C.     COUNT  III — ASSAULT

5.20.   Plaintiff incorporates each and every allegation set forth above.

5.21.   This Court has applied the general principles of tort law, as provided in the *Restatement (Second) of Torts*, in determining liability for assault under the FSIA, and has concluded that acts of terrorism, by their very nature, necessarily constitute assault under the ACT.   *See, e.g., Valore v.*

*Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010).   "The objective of terrorism is to use violence and fear to achieve political means."   *Gill v. Islamic Republic of Iran*, CV-15-2272 (RBW), 2017 WL 1289938, at * 9 (D.D.C. April 6, 2017); *referring* to *Black's Law Dictionary* (10th ed., 2014)(defining terrorism as "[t]he use or threat of violence to intimidate or cause panic, esp[ecially] as a means of achieving a political end"); and 22 U.S.C. § 2656f(d) (defining "terrorism" as "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents").   "Terrorism [is] unique among the types of tortuous activities in both its extreme methods and aims …. 'All acts of terrorism are by the very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror.'"   *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 37 (D.D.C. 2012), *citing Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (D.D.C. 2009)("The more extreme and outrageous, the greater the resulting distress.")

5.22.   Under the *Restatement (Second) of Torts*, Defendants are liable for assault if they acted intending to cause a harmful or offensive contact with Plaintiff or caused an imminent apprehension of such contact, and Plaintiff was thereby put in such imminent apprehension.   *See Gill*,  2017 WL 1289938, at * 9.

5.23.   Plaintiff was under assault by Defendants on a consistent basis for the entirety of his more than seven years of being a hostage.   As described herein, he was the subject of attacks at his home, his school, and on the streets during his detainment in Iran.   These attacks were unpredictable and, thus, Plaintiff was constantly in fear that he would be the subject of violence.   This was especially true throughout the portion of his detainment during which he was forced to

fight in the Iran-Iraq war, both in Iran and Iraq.

## D.     COUNT  IV — BATTERY

5.24.    Plaintiff incorporates each and every allegation set forth above.

5.25.    This Court looks to the *Restatement (Second) of Torts* in determining claims for battery which requires that Defendants acted intending to cause a harmful or offensive contact or to cause an imminent apprehension of such contact, and a harmful contact with Plaintiff directly or indirectly resulted.  *See, e.g., Gill*,  2017 WL 12899938, at * 9.  "Harmful contact" includes "any physical impairment of the condition of another's body, or physical pain or illness." *Cohen*, 2017 WL 818208, at *6.

5.26.    The torture described, herein, sets out numerous acts of Defendant IRGC, as well as other officials, employees, or agents of Defendant Iran, wherein Defendants intentionally caused harmful or offensive contact where such contact occurred against Plaintiff's person, and resulted in harmful contact.

## E.     COUNT  V — FALSE IMPRISONMENT

5.27.    Plaintiff incorporates each and every allegation set forth above.

5.28.    This Court has allowed for recovery, under the FSIA, for false imprisonment when a Defendant "(a) acts intending to confine the other … within boundaries fixed by the actor, and (b) his act directly or indirectly results in such a confinement of the other, and (c) the other is conscious of the confinement or is harmed by it." *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 343 (D.D.C. 2016).

5.29.   Plaintiff was initially falsely imprisoned by virtue of being taken hostage in November of 1979.  The confines of the original hostage boundary were dramatically diminished, and his life made drastically more perilous and precarious, when he was abducted by Defendant IRGC on or about September 20, 1986.   Defendants willfully and intentionally abducted Plaintiff with the purpose of using him in the Holy Defense as a soldier and, later, as an American Martyr for Khomeini.   Accordingly, Plaintiff was confined to the military bases near the Iran-Iraq border, the Iran-Iraq battlegrounds and, on one occasion, placed at an enemy target in Iraq.  This false imprisonment lasted three months until Plaintiff was able to go into hiding with smugglers on or about December 20, 1986.

5.30.   During the time in which he was detained and confined by Defendants, Plaintiff was fully conscious and aware of such confinement and detention.

5.31.   By reason of Defendants' acts in confining or detaining Plaintiff, he suffered damages including, but not limited to, loss of liberty, severe emotional distress, bodily injury, and economic damages.

## F.      COUNT VI — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

5.32.   Plaintiff incorporates each and every allegation set forth above.

5.33.   This Court has relied upon the following elements in determining claims for a cause of action for intentional infliction of emotional distress under the FSIA:  (1) extreme and outrageous conduct on the part of the Defendants which (2) intentionally or recklessly (3) caused the Plaintiff severe emotional distress.   *See, e.g, Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 21 (D.D.C. 2016).

5.34.   This Court has previously held that acts of terrorism are *per se* extreme and outrageous. *Id.*; *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 85 (D.D.C. 2006)(a terrorist attack constitutes extreme and outrageous conduct); *Valore*, 700 F. Supp. at 77.

5.35.   Plaintiff endured more than seven years of severe emotional distress while a hostage of the Defendants.   As an American and Christian adolescent forced to live in post-revolutionary Iran, he was constantly threatened and made the subject of unpredictable verbal and physical attacks both at school and on the streets.   His daily life was further tainted by the continual sirens and bombings of the Iran-Iraq war, as well as the seemingly endless violence surrounding him on the streets in Iran.   Upon being abducted by Defendant IRGC as a sixteen-year-old on or about September 20, 1986, and being forced to participate in the Holy Defense of Iran, he feared for his life and remained terrified to his very core every minute of every hour of each of the ninety days he was so detained.   This Court has previously recognized that even "[t]hirty minutes for a 16-year-old facing the fear of death would be an eternity," and awarded a one million dollar judgment for that singular harm.   *Fraenkel v. Islamic Republic of Iran*, CV-15-1080 (RMC), —F. Supp. 3d —, —, 2017 WL 1214353, at *14 (D.D.C. March 31, 2017).

## VI.   DAMAGES

## A.   THREE DISTINCT HARM PHASES

6.1.   Plaintiff suggests partitioning the assessment of Plaintiff's damages into *three distinct harm phases*.

### 1.    "Not Going Anywhere"

6.2.    Chronologically, the *first* distinct harm phase commenced with his father's arrest, trial, and being found guilty — all within two days.  The execution of the entire family for Treason against Iran and its leader, Khomeini, was *stayed* so long as (1) they remained in Iran, and (2) Plaintiff's father trained Iranian citizens to be engineers capable of operating and maintaining the then shuttered, and soon to be nationalized, factories.

6.3.    During this *we won't kill you or your father so long as you both do exactly as we say* phase, Plaintiff was repeatedly attacked, denied a proper education, and was subjected to discrimination.

6.4.    This phase lasted *almost all of seven years*.  By best calculation, approximately 2,518 days elapsed from the time that Plaintiff became a hostage in 1979 through the commencement of the second distinct phase of harm.

### 2.    Gun in the Hand, or Bullet in the Head

6.5.    The *second phase* was the most lethal.   It began when the Plaintiff was imprisoned by Defendant IRGC and forced to fight in deadly combat against Iraq, or be killed.

6.6.    At *90 days*, it was also the briefest phase.

### 3.    Every Day Since

6.7.    Plaintiff entered the *third distinct phase* for the purposes of assessing his harm when he escaped the war into the care of smugglers, and then to freedom.  He was eighteen years old.

6.8.    Three decades have since passed.  The harms have not.  Nor will they ever.

6.9.    These continuing harms are both *economic* due to Plaintiff's diminished earning capacity, and *noneconomic* owing to his continuing anguish.

6.10.    Conservatively allowing for a life expectancy of just two more decades — until Plaintiff is

68 — this third phase spans *50 years*.

**B.    PAIN AND SUFFERING**

**1.    Authority & Precedent Calculations**

6.11.    In December of 2012, this Court issued *Findings of Fact and Conclusions of Law* in *Wyatt v.*

*Syrian Arab Republic*, 908 F. Supp. 2d 216, 231-32 (D.D.C. 2012), *aff'd*, 554 Fed. Appx. 16 (D.C.

Cir. 2014), a case involving the kidnapping of the plaintiffs and their being held captive for 21

days.

6.12.    As to pain and suffering, the Court stated[1]:

> Calculating pain and suffering damages is a difficult task [ ].   In hostage cases,
> some courts have calculated damages on a *per diem* basis — awarding $10,000 per day
> held in captivity.   *See, e.g., Price v. Socialist People's Libyan Arab Jamahiriya* (D.D.C.2005)
> (awarding $1,050,000 in pain and suffering for 105 days of captivity).   However, in
> *Price*, where this Court followed the *per diem* calculation, it also added a significant
> amount ($7,000,000) to the *per diem* amount to compensate plaintiffs for pain and
> suffering that occurred subsequent to the kidnapping.   Moreover, in cases where the
> victims suffered harsh treatment and/or were held only briefly, some courts have also
> dispensed with the *per diem* measure altogether.   *See Cronin v. Islamic Republic of Iran*
> (D.D.C.2002) (concluding that the *per diem* approach undercompensated plaintiff who
> had been beaten severely while in captivity for only four days, and awarding a lump

---

[1]      Internal citations omitted.

sum of $1,200,000) [ ].

Marvin Wilson and Ronald Wyatt were held for 21 days.   They would be entitled to $210,000 each under the *per diem* measure.   This amount is inadequate to compensate plaintiffs for their injuries.   Approximately the same amount was awarded to a victim of false arrest and detention in a D.C. police station that lasted no more than a day, but hostage plaintiffs here were subjected to far worse treatment.   True, unlike the plaintiff in *Cronin*, Wilson and Wyatt were not physically beaten during their captivity, but they were subjected to other forms of physical abuse:   they were subjected to long marches at gunpoint through the biting cold of the Turkish wilderness and denied adequate shelter, clothing and food, and [ ] Mr. Wyatt [had] "his leg had been badly injured during the abduction."   The men were also subjected to a variety of psychological abuse, including repeated threats of death, being lined up for a simulated execution, being forbidden to speak with one another for several days, being forced to listen to anti-American PKK propaganda, and above all, being forced to endure the uncertainty of knowing whether they would live to see their families again.   Moreover, after returning home, both had lingering physical and psychological effects from this experience.   All of this calls for an award greater than what the per diem calculation would require.

Plaintiffs request $5,000,000 for each victim in pain and suffering.   This amount roughly comports with previous awards of pain and suffering by this Court for FSIA hostage cases.   See *Price* (awarding $8,050,000 in total pain and suffering to

hostage victims); *Cronin*, (awarding $1,200,000 in total pain and suffering to a hostage victim).   Accordingly, the Court finds that an award to each victim of $5,000,000 in pain and suffering damages is appropriate.

6.13.   As this Court stated in awarding $1,000,000 in *Fraenkel*, "[t]hirty minutes for a 16-year-old facing the fear of death would be an eternity."  *Fraenkel*, 2017 WL 1214353, at *14.

## 2.   Application of Calculations

6.14.   As to the ***first phase*** — while father and 10-year old son were threatened with death unless they remain in Iran and were subjected to abuse — Plaintiff does *not* ask the Court to apply a $10,000 *per diem*.

6.15.   Rather, Plaintiff seeks a lesser *per diem* of $3,000 for that phase.

6.16.   As the phase lasted approximately 2,518 days, the result is $7,554,000.

6.17.   The ***second phase*** — in which a teenager was pressed into life or death combat — Plaintiff suggests a $250,000 *per diem* rather than a strict application of the *Fraenkel* $1,000,000 baseline.

6.18.   Given the 90 combat days, the amount is $22,500,000.

6.19.   As to the ***third phase*** — every day since his escape, and every day for the rest of his life — $100 *per diem* is proposed.

6.20.   A fifty-year phase, at $100 *per diem*, the total is $1,826,250.

6.21.   The combined tally of these phases is $31,880,250.

C.    **ECONOMIC DAMAGES**

1.    **Authority & Precedent Calculations**

6.22.   This Court has held that economic damages for lost future earnings are permissible under the FSIA so long as the amount of those damages are proven by a reasonable estimate.  *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 77 (D.D.C. 2015).

2.    **Application of Calculations**

6.23.   Plaintiff was denied a proper education during the formative ages of ten through eighteen.

6.24.   Plaintiff was forced to attend an anti-American, propagandist school where he was pushed back to first grade at ten years of age because he was deemed not to be proficient in the Muslim-related subjects.

6.25.   At the age of fifteen, after refusing to step on an American Flag, he was expelled.

6.26.   Because of Defendants' acts, Plaintiff had the education of a ten-year-old upon his return to the United States at the age of eighteen.  Plaintiff now seeks damages for lost earning capacity due to the nearly eight-year interruption in his education.

6.27.   Plaintiff's earning capacity is further diminished by on-going post-traumatic stress.

6.28.   Given fifty years in the workforce, with an average loss of just $10,000 per year, the economic damages would be $500,000.

D.    **PUNITIVE DAMAGES**

1.    **Authority & Precedent Calculations**

6.29.   This Court also addressed punitive damages in the December of 2012, *Findings of Fact and*

*Conclusions of Law* in *Wyatt*[2]:

> In *Gates v. Syrian Arab Republic* [D.D.C. 2008], Judge Collyer awarded $300,000,000 in punitive damages against Syria, which she found had provided material support for a terrorist organization responsible for the videotaped execution of two U.S. civilian contractors.
>
> Here, the evidence shows Syria supported, protected, harbored, aided, enabled, sponsored, and subsidized the PKK, a known terrorist organization whose operations included the kidnapping of plaintiffs.   The brutal character of the kidnapping in this case, the significant harm it caused both the hostage plaintiffs and their families, along with Syria's demonstrated and well known policy to encourage terrorism all merit an award of punitive damages.   *See, e.g., Cronin* (D.D.C.2002) (finding the character of the defendant's act — where the defendant provided material support and resources to terrorist organizations to carry out acts such as kidnapping and torture — supported a punitive damage award of $300,000,000). This Court will follow the measure used against the same defendant in the Gates case, and award punitive damages against Syria in the amount of $300,000,000.

*Wyatt*, 908 F. Supp. 2d at 233.

## 2.    Application of Calculations

6.30.   In that $300,000,000 was the award in *Wyatt*, and that $300,000,000 was the award in *Cronin*, Plaintiff proposes an award herein of the same $300,000,000 for punitive damages.

---

[2]     Internal citations omitted.

## VII.  PRAYER  FOR  RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court grant, in his favor, as follows:

(a)     Judgment against all Defendants, *jointly and severally*, for compensatory damages in the amount of $32,380,250;

(b)     Judgment against all Defendants, *jointly and severally*, for punitive damages in the amount of $300,000,000; and

(c)     Such other and further relief that the Court may determine to be just and equitable under the circumstance.

Date:  August 22, 2017.                    Respectfully submitted,

Marc C. Lenahan
D.D.C. Bar No. TX0138
Law@Lenahan.com
LENAHAN LAW, P.L.L.C.
2655 Villa Creek, Suite 204
Dallas, Texas 75234
214.295.1008
888.473.2820 toll-free
214.295.2664 fax

ATTORNEY  FOR  PLAINTIFF