UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DARIOUSH RADMANESH, | ) )  ) |
| Plaintiff, | ) ) |
| v. | ) )   Case No. 17-cv-1708 (GMH) |
| THE GOVERNMENT OF THE ISLAMIC REPUBLIC OF IRAN, | ) ) ) ) |
| Defendant. | ) ) ) |

## MEMORANDUM OPINION AND ORDER

This matter was referred to the undersigned for all purposes.[1] Plaintiff Darioush Radmanesh brought this action under the Foreign Sovereign Immunities Act's ("FSIA") state sponsor of terrorism exception ("terrorism exception"). 28 U.S.C. § 1605A. He seeks to hold the Government of the Islamic State of Iran ("Iran")[2] to account for the abuse and torment he suffered during the several years he was forced to live in Iran and for the three months he was forced to serve as a wartime soldier in the Iranian military.

---

[1] Under the Federal Magistrate Act, magistrate judges may, with the consent of the parties, preside over "any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court." 28 U.S.C. § 636(c)(1). A party may, through conduct, impliedly consent to a magistrate judge's jurisdiction. *Roell v. Withrow*, 538 U.S. 580, 591 (2003). On this basis, at least one court in this district has found a party's default effected consent to a magistrate judge's jurisdiction to decide a motion for default judgment. *See Baker v. Socialist People's Libyan Arab Jamahirya*, 810 F. Supp. 2d 90, 98 (D.D.C. 2011) ("[D]efaulting nullifies any right to argue the absence of the magistrate judge's jurisdiction. . . ."); *see also Wellness Int'l Network, Ltd. v. Sharif*, __ U.S. __, __, 135 S. Ct. 1932, 1941, 1947–49 (2015) (applying *Roell*'s implied consent standard and holding that a bankruptcy judge may enter default judgment against an absent party where their defaulting conduct evinces consent to the bankruptcy judge's jurisdiction).

[2] Plaintiff's complaint included claims against both Iran and the Army of the Guardians of the Islamic Revolution ("IRGC"). ECF No. 1. However, in June 2018 Plaintiff filed a notice of voluntary dismissal of IRGC. ECF No. 17. In July 2018, the Court dismissed the claims against IRGC without prejudice. Minute Order dated July 26, 2018.

Currently before the Court is Plaintiff's motion for entry of default judgment. After thorough review of the record,[3] and consideration of this Court's case law adjudicating similar actions against foreign sovereigns, Plaintiff's Motion will be denied, and his claims dismissed for want of subject matter jurisdiction.

## I. LEGAL STANDARD FOR ENTRY OF A DEFAULT JUDGMENT AGAINST A FOREIGN SOVEREIGN

The Federal Rules of Civil Procedure grant district courts discretion to enter a default judgment upon a party's motion. Fed. R. Civ. P. 55(b)(2). A default judgment is normally available when, as here, "the adversary process has been halted because of an essentially unresponsive party." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (internal quotation marks omitted). The party seeking the judgment must demonstrate that the court has both subject matter jurisdiction over the action and personal jurisdiction over the absent defendant. *See Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016).

Additionally, before a default judgment can be entered against a foreign sovereign, the FSIA requires a plaintiff to establish "his claim or right to relief by evidence satisfactory to the court." *Thuneibat*, 167 F. Supp. 3d at 33 (quoting 28 U.S.C. § 1608(e)). A court must thoroughly review a plaintiff's allegations and evidence against an absent foreign sovereign. *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014); *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 16–17 (D.D.C. 2016). While a court "may not unquestioningly

---

[3] The relevant docket entries are (1) Plaintiff's Complaint (ECF No. 1); (2) Minute Order dated March 2, 2018; (3) Certificate of Clerk Mailing Copy of Summons and Complaint to Iran (ECF No. 12); (4) Plaintiff's Affidavit Regarding Foreign Mailing (ECF No. 13); (5) Plaintiff's Notice of Dismissal of IRGC (ECF No. 17); (6) Minute Order dated July 26, 2018; (7) Return of Service Concerning Diplomatic Service (ECF No. 18); (8) Plaintiff's Motion for Entry of Default Judgment (ECF No. 21); (9) Declaration of Plaintiff in Support of Motion for Entry of Default Judgment (ECF No. 21-2); and (10) Plaintiff's Proposed Findings of Fact and Conclusions of Law in Support of Motion for Entry of Default Judgment (ECF No. 22). Citations to page numbers reflect the pagination assigned by the Court's Electronic Case Filing system.

accept a complaint's unsupported allegations as true," *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012), "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true." *Thuneibat*, 167 F. Supp. 3d at 33; *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015). An evidentiary hearing is not required; rather, a "plaintiff may establish proof by affidavit." *Reed*, 845 F. Supp. 2d at 212; *see also Mwani*, 417 F.3d at 7 ("In the absence of an evidentiary hearing, although the plaintiffs retain 'the burden of proving personal jurisdiction, [they] can satisfy that burden with a *prima facie* showing.' . . . [T]hey may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." (quoting *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991))). The court may also "take judicial notice of related proceedings and records in cases before the same court." *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 43 (D.D.C. 2008).

## II. PROCEDURAL HISTORY

Plaintiff filed suit in August 2017 (ECF No. 1) under the FSIA's terrorism exception to sovereign immunity. *See* 28 U.S.C. § 1605A. The statute allows service to be made upon a foreign state

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
>
> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
>
> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

> (4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services--and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C.A. § 1608(a). The Court took judicial notice, that there are no special arrangements for service between Iran and United States-based plaintiffs and that Iran is not a party to any applicable international convention on service of judicial documents. ECF No. 10; Minute Order dated March 2, 2018. Thus, the Court concluded service pursuant to 28 U.S.C. § 1608(a)(1) or (2) was not possible and authorized Plaintiff to attempt service in accordance with 28 U.S.C. 1608(a)(3). Minute Order dated March 2, 2018.

Plaintiff therefore attempted service on Iran by mailing a copy of the summons and complaint and notice of suit, along with a translation of those materials into Farsi, the official language of the Islamic State of Iran. *See* ECF No. 12 (certifying court mailing of the materials). Service was attempted on March 18, 2018, by the carrier DHL but was refused by Iran. ECF No. 13, ¶ 5. The Court, concluding Plaintiff could confirm only that service was attempted on Iran, notified Plaintiff he must clarify whether service by mail was attempted on IRGC before proceeding to attempt service on that entity pursuant to 28 U.S.C. § 1608(a)(4). Minute Order dated June 5, 2018.

After difficulty in ascertaining the state of mailed service on IRGC, in June 2018 Plaintiff filed a notice of voluntary dismissal of IRGC. ECF No. 17. In July 2018 the Court dismissed the claims against IRGC without prejudice. Minute Order dated July 26, 2018. Plaintiff then served Iran in accordance with 28 U.S.C. § 1608(a)(4) through diplomatic channels on October 1, 2018.

4

ECF No. 18. Iran had until November 30, 2018 to respond to the complaint. *See* 28 U.S.C. 1608(d) ("[A] foreign state . . . shall serve an answer or other responsive pleading to the complaint within sixty days after service has been made under this section"). Iran did not respond within the allotted time. *See* Minute Order dated January 24, 2019. At Plaintiff's request, the Clerk of the Court entered default against Iran on December 10, 2018. ECF No. 19; ECF No. 20. Plaintiff now seeks a default judgement pursuant to Federal Rule of Civil Procedure 55(b)(2). ECF No. 21.

### III. BACKGROUND

#### A. Findings of Fact

1. Forced to Stay in Iran

Plaintiff was born in Kirksville, Missouri in 1969. ECF No. 21-2, ¶ 4.1. Plaintiff's mother is American, a native of Kirksville. *Id.* His father is Iranian and met his mother while studying as an Iranian exchange student at Northeast Missouri State University. *Id.* Plaintiff was raised and remains a devout Christian. *Id.* In 1975, Plaintiff's family moved to South Carolina where Plaintiff's father received job training to become an engineer for Polyacryl Iran, a DuPont affiliate. *Id.*, ¶ 4.2. In 1978, after his father's training was complete, Plaintiff's family moved together to Isfahan, Iran, so his father could start his job with Polyacryl. *Id.*, ¶ 4.3. Plaintiff and his family were living in Iran during the Iranian Revolution in 1979. *Id.*, ¶ 4.4. After the Shah of Iran was overthrown, Plaintiff's father was charged and summarily convicted of treason against Iran. *Id.*, ¶¶ 4.6–4.7. Plaintiff and his family "were told that they would be executed as spies unless (1) they remained in Iran, and (2) Plaintiff's father trained Iranian citizens to be engineers capable of operating and maintaining the then shuttered, and soon to be nationalized factories." *Id.*, ¶ 4.7. Plaintiff believes that this "forced *quid pro quo*" saved the lives of his family, but "required they remain in Iran." *Id.*

5

In the years that followed, Plaintiff alleges he "was coerced into [attending] the Iranian-run, Anti-American, school system."[4] *Id.,* ¶ 4.9. Although ten years old, Plaintiff was "pushed back to first grade" because he was deemed not proficient in Farsi or Arabic. *Id.,* ¶¶ 4.5, 4.9. Plaintiff alleges he was often "pushed to the ground, spat upon, and then kicked" by other students "while they chanted 'Death to Americans.'" *Id.,* ¶ 4.10. Sometimes during these attacks, Plaintiff could see the "school principal watching and laughing." *Id.* The Basaji—a youth paramilitary organization operating under the IRGC—also abused Plaintiff by shouting at him, "physically attacking" him, and drenching him in urine. *Id.,* ¶ 4.11. Plaintiff alleges he was once hospitalized after the Basaji "punched [him] in the face, knocked him to the ground, and kicked him all over his body." *Id.* Plaintiff suffered broken ribs (which never fully healed), contusions all over his body, lacerations, and a concussion from this attack. *Id.*

During this time, Plaintiff was exposed to "violence on the streets around him." *Id.,* ¶ 4.12. At the age of thirteen, Plaintiff witnessed a naked, pregnant woman being stoned to death. *Id.* He also witnessed the IRGC routinely mock, curse at, and beat his mother because she was American and a Christian. *Id.,* ¶ 4.13. After being expelled from school at the age of fifteen for refusing to step on the American flag, Plaintiff moved to Shaheen-Shahr, Iran, and went to work in a machine shop. *Id.,* ¶ 4.15. In August 1986, Iraqi jets bombed the machine shop in which Plaintiff worked. *Id.,* ¶ 4.16. After the attack, Plaintiff quit his job at the machine shop. *Id.,* ¶ 4.18.

    2.    Conscripted into Iranian Military

Around September 1986, Plaintiff, then sixteen years old, was "grabbed by the neck, dragged into a truck, and transported" to an Iranian military base. *Id.,* ¶ 4.19. There, he was told he had been conscripted and was now an Iranian soldier in the Iran-Iraq War. *Id.* He was forced

---

[4] The American School Plaintiff had previously attended was closed in the aftermath of the 1979 Revolution. ECF No. 21-2 ¶ 4.9.

to go through a version of basic training: "[h]is head was shaved," he was forced "to run for hours in the desert [in] . . . extreme heat," and "to undergo training on RPG-7 Russian bazookas, hand-to-hand combat, knife-fighting," and "how to stealthily approach enemy soldiers to strangle them with wire." *Id.*, ¶ 4.20. Plaintiff was allowed "one phone call to tell his family good-bye" before being ordered into battle. *Id.*, ¶ 4.21.

During the ninety days he served in the military, Plaintiff was sent into battle where he witnessed members of his unit killed. *Id.*, ¶¶ 4.22–4.23. He also witnessed the IRGC use children to clear mine fields. *Id.*, ¶ 4.25. Plaintiff saw these children being killed by the mines and had to climb over their dead bodies. *Id.* Plaintiff alleges he was "continually surrounded by bodies of adults and children so badly injured that their remains were unrecognizable." *Id.* Eventually, Plaintiff was sent on a detail in Iraqi territory. *Id.*, ¶¶ 4.27–4.28. Before this mission, he was informed he was being "sent to [his] death . . . so that the Khomeini government could proclaim him as an American Martyr for Islam." *Id.*, ¶ 4.27. During this mission, Plaintiff was "forced by his commander, at gunpoint, to shoot a sleeping Iraqi soldier in the head at point blank range." *Id.* at ¶ 4.28. Plaintiff survived the mission and was subsequently sent back to the front lines. *Id.*, ¶ 4.29. After one battle, Plaintiff was found delirious in a trench. *Id.* He was subsequently hospitalized, where doctors determined he had suffered a nervous breakdown and diagnosed him with post-traumatic stress disorder ("PTSD"). *Id.*, ¶ 4.29. He was sent home to his family in December 1986 for twoweeks of leave. During that leave, Plaintiff's family paid to have him smuggled out of Iran. *Id.*, ¶¶ 4.30–4.33.

### 3. After Leaving Iran

Plaintiff suffered from severe PTSD for six years following his escape from Iran. *Id.*, ¶ 4.34. During that time, he "could not bring himself to leave his room, preferring to stay in the dark

7

with the blinds closed." *Id.* He was unable to attend school or keep a job for any meaningful length of time and underwent psychological and psychiatric treatment. *Id.* Plaintiff continues to suffer from flashbacks, panic attacks, nightmares, and insomnia. *Id.* Additionally, Plaintiff still suffers dizziness, numbness in his left hand, back pain, muscle spasms in his neck, and has "ribs that dislocate when he reclines in certain positions." *Id.*, ¶ 4.35.

### B. Plaintiff's Claim for Relief

Plaintiff avers he was taken hostage and tortured by Defendant. *See id.*, ¶¶ 4.5–4.35; ECF No. 1, ¶ 5.10–5.19. As a result, Plaintiff argues, Defendant is stripped of its sovereign immunity pursuant to 28 U.S.C. § 1605A(a)(1), and subject to tort liability pursuant to 28 U.S.C. § 1605A(c). Plaintiff claims that Defendant's hostage-taking and torture constituted following torts against him: assault, battery, false imprisonment, and intentional infliction of emotional distress. ECF No. 1, ¶¶ 5.20–5.35.

Plaintiff seeks $32,380,250 in compensatory damages and $300,000,000 in punitive damages. *Id.*, ¶¶ 6.14–6.30. He calculates his compensatory damages in three phases. First, he seeks $3,000 per day for the years he was forced to stay in Iran prior to his conscription. *Id.*, ¶¶ 6.14–6.15. Second, he seeks $250,000 per day for the 90 days he was forced to serve in the Iranian military. *Id.*, ¶¶ 6.17–6.18. Third, he seeks $100 per day for each day after his military service ended for the rest of his life. *Id.*, ¶¶ 6.19–6.20. Plaintiff also seeks $500,000 in economic damages for lost earnings resulting from the disruption of his education after the 1979 Iranian Revolution. *Id.*, ¶¶ 6.23–6.28.

### IV. CONCLUSIONS OF LAW

A default judgment may be entered against a foreign sovereign defendant when (1) subject matter jurisdiction over the claims is established; (2) personal jurisdiction is properly exercised

8

over the defendant; (3) the plaintiff has satisfactorily presented evidence establishing the defendant's liability to the plaintiff; and (4) the plaintiff has satisfactorily proven he is entitled to the monetary damages he seeks. *See Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017).

Section 1330(a) of Title 28 grants this Court original subject matter jurisdiction "without regard to amount in controversy" over (1) nonjury civil actions (2) as to any claim for relief *in personam* (3) against a foreign state (4) provided that the foreign state is not entitled to immunity under sections 1605–1607 of the FSIA. *See* 28 U.S.C. § 1330(a); *see also Reed*, 845 F. Supp. 2d at 210; *Braun*, 228 F. Supp. 3d at 75. The first three elements have plainly been met here. First, Plaintiff has brought a nonjury civil action. ECF No. 1 ¶ 1.1. Second, this is an action seeking relief *in personam*, rather than *in rem* (i.e., the Court is asked to exercise personal jurisdiction over Defendant as a legal person, and not to exercise such jurisdiction over any property). *See* ECF No. 1 ¶ 3.2; *see also Reed*, 845 F. Supp. 2d at 210 (finding "the court has personal jurisdiction over the defendant[, Iran,] as legal persons"). Third, Iran is a foreign sovereign. *See Braun*, 228 F. Supp. 3d at 75, 87 n.3.

The fourth requirement for subject matter jurisdiction—that Defendant is not entitled to foreign sovereign immunity under the FSIA—requires further discussion. Plaintiff argues this Court has jurisdiction because Iran took him hostage and tortured him, both of which trigger the FSIA's terrorism exception to the sovereign immunity otherwise granted to foreign states. 28 U.S.C. § 1605A. That exception provides, in pertinent part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking . . . if such act . . . is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). A victim seeking relief under this exception must prove that (1) "the foreign state was designated as a state sponsor of terrorism at the time the act . . . occurred," § 1605A(a)(2)(A)(i)(I); (2) "the claimant or the victim was, at the time the act . . . occurred a national of the United States," § 1605A(a)(2)(A)(ii)(I); (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration," § 1605A(a)(2)(A)(iii); and (4) an official, employee, or agent of the foreign state, while acting within the scope of his or her office, employment, or agency, (5) engaged in an act of hostage-taking or torture that caused personal injury or death, § 1605A(a)(1); *see also Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015). While it is clear the second and third elements are satisfied,[5] the Court finds that (1) it is unclear whether all of the acts about which Plaintiff complains occurred after Iran's designation as a state-sponsor of terror and (1) in any case, Plaintiff has failed to satisfy the final two elements.

Plaintiff alleges he was taken hostage and tortured over a seven-year period between November 1979 and December 1986,[6] when he left Iran. *See* ECF No. 21-2 ¶¶ 4.5–4.31. The U.S.

---

[5] Plaintiff was and remains a U.S. citizen and national. ECF No. 21-2 ¶ 3.1. Plaintiff also provided Iran an opportunity to arbitrate. *See* ECF No. 10 ¶ 5.d (requesting "two copies of Plaintiff's Offer to Arbitrate this matter together with translations of same into Farsi, the official language of the foreign state," be sent to Iran by the Clerk of the Court along with the summons and complaint). Iran did not respond to the offer to arbitrate. *See* Minute Order dated January 24, 2019. Nothing more is necessary to satisfy the requirement of an opportunity to arbitrate. *See Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 233–35 (D.C. Cir. 2003) ("a reasonable opportunity to arbitrate" need not precede the filing of the complaint).

[6] The Court notes Plaintiff's claims may be untimely pursuant to 28 U.S.C. § 1605A(b), which requires, in relevant part, that the claim be filed within ten years after the cause of action occurred. Plaintiff left Iran on or about December 1986, more than thirty years prior to the filing of this claim. ECF No. 21-2 ¶¶ 4.29–4.31. It would be hard to argue Plaintiff's cause of action did not accrue then. Though this statute of limitations has been ruled non-jurisdictional, *Owens v. Republic of Sudan*, 864 F.3d 751, 801 (D.C. Cir. 2017), this Court has previously found in FSIA cases that it is within its discretion to raise the statute of limitations defense *sua sponte* on behalf of an absent sovereign. *Sheikh v. Republic of Sudan*, 308 F. Supp. 3d 46, 50 (D.D.C. 2018), *reconsideration denied sub nom. Kinyua v. Republic of Sudan*, 326 F.R.D. 16 (D.D.C. 2018), *appeal docketed* No. 18-7060 (D.C. Cir. Apr. 26, 2018); *Maalouf v. Islamic Republic of Iran*, 306 F. Supp. 3d 203, 208 (D.D.C. 2018), *appeal docketed* No. 18-7052 (D.C. Cir. Apr. 16, 2018). The Court need not address whether doing so would be appropriate in this case because, as discussed below, it has found other grounds on which Plaintiff's claims must be dismissed.

Department of State designated Iran a state-sponsor of terror in January 1984. State Sponsors of Terror, U.S. Dep't of State, https://www.state.gov/j/ct/list/c14151.htm (last visited Apr. 23, 2019). At least some of the alleged abuses Plaintiff suffered at the hands of Defendant occurred in the four years prior to Iran's designation but it is unclear from the record which those are. However, this question need not be resolved as, even assuming all of the alleged abuse occurred after Iran's designation, Plaintiff's claims still fail as they do not satisfy the fourth and fifth elements for establishing subject matter jurisdiction under the terrorism exception. Therefore, the Court's analysis proceeds on the assumption that all alleged abuse either occurred or continued to occur after Iran was designated a state-sponsor of terror.

With regard to those two elements, Plaintiff must prove that an official, employee, or agent of the foreign state, while acting within the scope of his or her office, employment, or agency, engaged in an act of hostage-taking or torture that caused personal injury or death to Plaintiff. 28 U.S.C. § 1605A(a)(1). The FSIA incorporates the definition of "hostage-taking" included in the International Convention Against the Taking of Hostages. 28 U.S.C. § 1605A(h)(2). Thus, for purposes of the FSIA as:

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the 'hostage') in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offence of . . . hostage-taking . . . .

International Convention Against the Taking of Hostages art. 1, Dec. 17, 1979, 1316 U.N.T.S. 21931; 28 U.S.C. § 1605A(h)(2). In *Price v. Socialist People's Libyan Arab Jamahiriya*, the D.C. Circuit clarified that, because "[t]he definition speaks in terms of conditions of release[,] the defendant must have detained the victim in order to compel some particular result, specifically to force a third party either to perform an act otherwise unplanned or to abstain from one otherwise

11

contemplated *so as to ensure the freedom of the detainee*." 294 F.3d 82, 94 (D.C. Cir. 2002) (emphasis added).

Even considering the facts alleged in the light most favorable to Plaintiff, there is no indication that he was taken hostage as that term has been defined under the FSIA. Plaintiff avers that he was taken hostage by Iran to extract labor (training people to run factories) from his father; in other words, the "quid" was his father's labor in exchange for the "quo," Plaintiff's release. *See* ECF No. 21-2 ¶ 4.7. The alleged facts simply defy this conclusion. True, Plaintiff's family was required to remain in Iran. *Id.* But Plaintiff attended school, was free to move about his community, even volitionally moved to another city for a job. *Id.,* ¶ 4.15. In other words, Plaintiff and his family were prevented only from leaving the country or, put differently, engaging in international travel. Barring international travel does not, however, constitute hostage-taking. *See Mohammadi*, 782 F.3d at 16. In *Mohammadi*, the plaintiffs claimed their parents had been "taken hostage" because they were not allowed to leave Iran. *Id*. Rejecting that claim, the D.C. Circuit explained: "[e]ven if plaintiffs' parents are barred from traveling abroad from Iran, there is no allegation that they have been 'seized or detained' within Iran under any ordinary understanding of those terms. Courts thus have found 'hostage taking' in cases involving physical capture and confinement, not restrictions on international travel." *Id.*

Even if being forced to live in Iran were considered a "detention," there is no way to read the facts as conditioning Plaintiff's release on Iran extracting a concession (labor) from his father. As alleged, Iran extracted labor from Plaintiff's father in exchange for Plaintiff's and his family's lives; it was not a *condition of Plaintiff's release* from the country. ECF No. 21-2 ¶ 4.7 ("Plaintiff and his family were told they would be executed as spies" unless they stayed in the country and Plaintiff's father trained people to run the nationalized factories). While this is abhorrent behavior

worthy of condemnation, the Court finds, based on the facts alleged, that Plaintiff was not taken hostage by Iran as that term is defined in the FSIA.

Plaintiff's second theory—that he was tortured by Iran—fares no better. The FSIA incorporates the definition of "torture" from the Torture Victim Protection Act. 28 U.S.C. § 1605A(h)(7). It defines "torture" as "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering . . . whether physical or mental, is intentionally inflicted on that individual." Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992); 28 U.S.C. § 1605A(h)(7). "Mental pain or suffering" is further defined as prolonged mental harm caused by or resulting from—

> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
>
> (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
>
> (C) the threat of imminent death; or
>
> (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

*Id.*

In *Price*, the D.C. Circuit gave extensive consideration to what conduct should be deemed "torture" under the FSIA. 294 F.3d at 92–93. The D.C. Circuit determined that whether an act satisfied the statutory definition of torture required assessing two components: (1) the severity of the pain and suffering intended and actually inflicted on the victim, and (2) the purposes for which such pain and suffering were administered. *Id.* As to the severity component, *Price* instructed that the conduct at issue must be "sufficiently extreme and outrageous to warrant . . . universal condemnation," and that "[t]he more intense, lasting, or heinous the agony, the more likely it is

to be torture." *Id*. However, "torture does not automatically result whenever individuals in official custody are subjected even to direct physical assault." *Id.* at 93. As the Circuit warned, "not *every* instance of excessive force used against prisoners[] is torture under the FSIA." *Id*. (emphasis in original). Rather, torture "is a label that is 'usually reserved for extreme, deliberate and unusually cruel practices,'" such as, "sustained, systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain." *Id.* at 93–94 (quoting S. Exec. Rep. No. 101-30, at 14 (1990)); *see also Simpson*, 326 F.3d at 234 (holding that allegations that the plaintiff was "interrogated and then held incommunicado," "threatened with death . . . if [she] moved from the quarters where she was held," and "forcibly separated from her husband," although reflecting a "bent toward cruelty," did not rise to the level of torture).

With respect to the purposes for which such pain and suffering is inflicted on the victim, the FSIA expressly condemns pain or suffering intentionally inflicted for "such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind." Torture Victim Protection Act, 106 Stat. 73; 28 U.S.C. § 1605A(h)(7). *Price* concludes that, while this list is not exhaustive, "[t]he 'for such purposes' language . . . suggests that any non-enumerated purpose would have to be similar in nature to those mentioned in order to elevate an act of violence into an act of torture." 294 F.3d at 93. The production of pain must be "purposive, and not merely haphazard" and for a foreign state to lose its sovereign immunity, the state must "impose suffering cruelly and deliberately, rather than as the unforeseen or unavoidable incident of some legitimate end." *Price*, 294 F.3d at 93. To constitute torture, therefore, the conduct at issue must be "both

14

intentional and malicious." *Id.*; *see also Han Kim*, 774 F.3d at 1050 ("[S]uffering alone is insufficient to establish a claim under the FSIA's terrorism exception. To qualify as torture, the mistreatment must be purposeful—that is, the defendant must have targeted the victim . . . .").

To determine whether Defendant tortured Plaintiff consistent with this definition, it is helpful to consider his experience in two phases: prior to his conscription and thereafter. Prior to conscription, Plaintiff alleges he was subjected to the following: verbal and physical abuse by his fellow students under the approving eye of a school official; verbal and physical abuse at the hands of the Basaji, resulting, at least once, in hospitalization; being forced to bear witness to extreme violence on the streets and to his mother being abused by the IRGC; and injuries sustained from an Iraqi military bombing[7] at his place of work. ECF No. 21-2 ¶¶ 4.8–4.18. As explained below, none of these incidents rises to the level of torture as the FSIA defines that term.

Plaintiff has failed to provide evidence that any of the acts committed against him prior to his conscription in the Iranian military were committed while Plaintiff was in Defendant's "custody or physical control." A sovereign cannot be found to have committed torture unless it had custody or physical control over the victim. Torture Victim Protection Act, 106 Stat. 73; 28 U.S.C. § 1605A(h)(7); *see also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 74 (D.D.C. 2010) (holding that where defendants carried out a terrorist bombing, they had not engaged in torture because "the defendants . . . never had custody or physical control over the victims"). As discussed above, while Plaintiff and his family were required to remain in Iran, there is no evidence that prior to conscription Plaintiff was in the custody or under the physical control of Defendant or its agents. Plaintiff attended school, freely moved about his community, even relocated to another town of

---

[7] The Court finds no way to attribute this action to Iran. Plaintiff was working in a machine shop of his own volition (ECF No. 21-2 ¶ 4.15) ("Plaintiff secured an apprenticeship at a machine shop"), and no facts in the record support a finding Iran was responsible for the Iraqi military's actions that day.

his own volition. *See* ECF No. 21-2 ¶¶ 4.9, 4.12, 4.15. Plaintiff has alleged no facts to support a finding that his movement within Iran prior to conscription was restricted in any way. *See generally id.* Therefore, the alleged acts of violence against Plaintiff prior to his conscription fail to satisfy the statutory definition of torture in the FSIA.

Even assuming Plaintiff was in the custody or physical control of Defendant during the alleged abusive acts prior to his conscription, Plaintiff has failed to provide evidence that any of those acts meet the severity requirement established in *Price*. Assuming, for the sake of argument, that the abuse Plaintiff suffered at the hands of his fellow students and the Basaji can be fairly attributed to Iran,[8] Plaintiff must offer evidence that the acts against him were sufficiently severe to constitute torture. *See Price*, 294 F.3d at 92 ("The severity requirement is crucial to ensuring that the conduct proscribed . . . is sufficiently extreme and outrageous to warrant . . . universal condemnation"). The evidence proffered shows that Plaintiff was mistreated and abused by his fellow students while the school principal "watch[ed] and laugh[ed]." ECF No. 21-2 ¶ 4.10. Plaintiff was "pushed to the ground, spat upon, and then kicked" by students chanting "Death to Americans." *Id.* While this is harsh treatment, it is not "sufficiently extreme and outrageous to warrant . . . universal condemnation." *See Price*, 294 F.3d at 92–94 (holding plaintiffs' general complaint they were "kicked, clubbed, and beaten" by prison guards insufficient to satisfy the FSIA's "rigorous definition of torture").

Plaintiff's claims regarding his treatment at the hands of the Basaji suffer the same defect. He was harassed, beaten quite badly on at least one occasion, and drenched with urine. ECF No. 21-2 ¶ 4.11. This constitutes abhorrent treatment, to be sure. However, "it is especially important

---

[8] There is a lack of evidence to support such a finding in either instance. Plaintiff asserts the Basaji is a "youth paramilitary organization operating under Defendant IRGC," but offers no evidence beyond this bare assertion to support such a finding. ECF No. 21-2 ¶ 4.11. He offers nothing whatsoever in this regard with respect to the classmates in his school who assaulted him. *See generally id.*

for the courts to ensure that foreign states are not stripped of their sovereign immunity unless they have been charged with actual torture, and not mere police brutality." *Price*, 294 F.3d at 93. Under the FSIA, not all mistreatment at the hands of a foreign sovereign or its agents is actionable. *See id.* Though the Basaji may have harassed and abused Plaintiff under color of law, such treatment is simply not sufficiently extreme and outrageous to meet the "rigorous definition of torture" in the FSIA. *See Price*, 294 F.3d at 93; *cf. Han Kim*, 774 F.3d at 1051 (finding that the plaintiff met his burden of proving torture under the FSIA where he introduced "evidence that the regime abducted the [victim], that it invariably tortures and kills prisoners like him, and that it uses terror and intimidation to prevent witnesses from testifying"); *see also Nikbin v. Islamic Republic of Iran*, 471 F. Supp. 2d 53, 62 (D.D.C. 2007) (finding a plaintiff tentatively made out an FSIA torture allegation where he alleged that he "was lashed forty times on particularly sensitive parts of his body with a weapon (a leather whip) designed for that exact purpose").

Regarding Plaintiff's claims he suffered for having to witness violence on the streets (e.g., the stoning to death of a pregnant woman) and the beating of his mother by the IRGC, Plaintiff has failed to allege any facts suggesting he was the intended target of such actions. As *Han Kim* makes clear "suffering alone is insufficient"; at a bare minimum to meet the purpose prong in *Price*, "the defendant must have targeted the victim." 774 F.3d at 1050. There are no facts in the record to support a finding that Plaintiff was the target of the violence he was made to witness. Therefore, the Court finds none of the alleged abusive acts by Defendant against Plaintiff prior to his conscription constitutes torture as it is defined in the FSIA.

Plaintiff's conscription into the Iranian military forces fails for similar reasons. Taking the facts he alleges as true, it is clear Plaintiff was in the custody or physical control of the Iranian military after his abduction in or about September 1986 when he was sixteen. *See* ECF No. 21-2

¶ 4.19. However, all evidence in the record suggests that after Plaintiff was conscripted he was treated like any other solider: head shaved, forced to run, trained on use of weaponry and stealth tactics, transferred to a military base, sent in to battle as part of an artillery unit, commanded to fight through minefields. *Id.,* ¶¶ 4.19–4.29. The Court takes note of the gruesome nature of Plaintiff's wartime experience. Particularly disturbing was an incident in which Plaintiff was forced by his commanding officer to shoot a sleeping Iraqi soldier in the head at point blank range. *Id.,* ¶ 4.28. This experience, undoubtedly, has had and continues to have a lasting, detrimental effect on Plaintiff, but it is not at all clear that it satisfies the severity requirement of *Price*.[9]

Even if forcing a child of sixteen into military battle were considered sufficiently extreme and outrageous to satisfy *Price*, it is not possible to conclude from the facts alleged that Plaintiff's wartime experience satisfies the *purpose* prong. The record indicates Plaintiff was a soldier in a war between Iran and Iraq for ninety days. ECF No. 1 ¶ 6.5; ECF No. 21-2 ¶¶ 4.19–4.29. Though conscription by a sovereign is not universally endorsed, Plaintiff's suffering does not appear to have been imposed for a purpose "similar in nature" to those expressly condemned by the FSIA (i.e., "obtaining from that individual . . . information or a confession, punishing that individual for

---

[9] Plaintiff does not cite any authority for the proposition that conscription meets the definition of "torture" under the FSIA. Historical precedent suggests the conclusion that it does not. Conscription, while far from universally endorsed by the international community, is not an uncommon practice. *See World Factbook*, Central Intelligence Agency, https://www.cia.gov/library/publications/the-world-factbook/fields/333.html (last visited Apr. 24, 2019) (listing Brazil, Denmark, Greece, Israel, Mexico, Singapore, South Korea, and Vietnam among the many countries that currently conscript members of their armed forces). The United States government has employed conscription in five conflicts: the Civil War, World War I, World War II, the Korean War, and the Vietnam War. Matthew Ivey, *The Broken Promises of an All-Volunteer Military*, 86 Temp. L. Rev. 525, 532–38 (2014); *see also Gillette v. United States*, 401 U.S. 437, 462 (1971) (recognizing that the impact of the United States' conscription laws on "objectors to particular wars is far from unjustified" because, among other things, those laws promote "the Government's interest in procuring the manpower necessary for military purposes, pursuant to the constitutional grant of power to Congress to raise and support armies."); *cf. Ghebremedhin v. Ashcroft*, 385 F.3d 1116, 1120 (7th Cir.), opinion modified on reh'g, 392 F.3d 241 (7th Cir. 2004) (observing in the asylum context, "Although it is well established that governments may draft citizens for military service and punish those who avoid the draft . . . it may be persecution to punish those who evade the draft based on genuine religious objections to military service." (internal citations omitted)). The history of conscription in the United States and elsewhere supports the conclusion that forced military service is not "sufficiently extreme and outrageous to warrant . . . universal condemnation." *See Price*, 294 F.3d at 92.

an act that individual committed or is suspected of having committed, intimidating or coercing that individual . . . or for any reason based on discrimination of any kind"). *See* Torture Victim Protection Act, 106 Stat. 73; 28 U.S.C. § 1605A(h)(7). Further, such suffering does not appear to have been divorced from some legitimate end, i.e., to win the war. *See Price*, 294 F.3d at 93 (explaining, for a foreign sovereign to lose immunity, it must "impose suffering cruelly and deliberately, rather than as the unforeseen or *unavoidable incident of some legitimate end*"(emphasis added)). Thus, on the facts alleged by Plaintiff, his suffering as a wartime soldier was not *intentionally* inflicted by Defendant but, rather, was "unavoidable" as a means toward a "legitimate end." *See id.* Put differently, because the alleged facts suggest he was treated like any other soldier, Defendant did not cause Plaintiff's suffering cruelly and deliberately; rather, he suffered like any other conscripted soldier for having to fight in a war.

Although Plaintiff alleges that one of his commanders told him he was "going to be sent to death on a new assignment so that the Khomeini government could proclaim him as an American Martyr for Islam," ECF No. 21-2 ¶ 4.27, his description of that mission belies any discriminatory purpose. Plaintiff does not allege that he was sent alone. Indeed, he explains that he was "assigned to a new unit" of soldiers and accompanied by at least one "commander." *See id.,* ¶ 4.28 (explaining that during this mission, Plaintiff "was forced by his commander" to shoot an Iraqi soldier). Moreover, Plaintiff describes what appears to be a fairly typical military mission: helicoptering into Iraqi territory to help destroy an ammunition depot. *Id.* Plaintiff survived the mission and was returned to the front lines. *Id.,* ¶ 4.29. Shortly thereafter, Plaintiff suffered what he describes as "a severe nervous breakdown," and his superiors sent him home to recuperate. *Id.* This sequence of events does not suggest that Plaintiff was treated differently from any other soldier. For this reason, it is not plausible that Iran's purpose in sending Plaintiff into battle was discriminatory.

Accordingly, while Plaintiff's experience was no doubt traumatic, Iran's purpose in subjecting him to it was not among those proscribed under the FSIA's definition of torture. Thus, the Court finds Plaintiff's forced military service does not constitute torture as it is defined in the FSIA.

Having found that Plaintiff has failed to allege facts to support a finding that Defendant engaged in acts of hostage-taking or torture against him, Plaintiff has failed to show that Defendant should be stripped of its sovereign immunity under 28 U.S.C. § 1605A(a). Plaintiff, therefore, has failed to establish subject matter jurisdiction in this court pursuant to 28 U.S.C. § 1330(a) and his claims must be dismissed.

## V. CONCLUSION

For the reasons stated above, it is hereby **ORDERED** that Plaintiff's Motion for Default Judgment is **DENIED,** and his claims dismissed without prejudice for want of subject matter jurisdiction.

Date: April 24, 2019

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE