# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DARIOUSH RADMANESH, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> THE GOVERNMENT OF THE ) <br> ISLAMIC REPUBLIC OF IRAN, ) <br> ) <br> Defendant. ) <br> ) | Case No. 17-cv-1708 (GMH) |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Darioush Radmanesh's motion for a new trial following the denial of his motion for default judgment under the Foreign Sovereign Immunities Act's ("FSIA") state sponsor of terrorism exception ("terrorism exception") and the dismissal of this action for lack of subject matter jurisdiction. 28 U.S.C. § 1605A; ECF No. 25; ECF No. 26.[1] For the reasons that follow, Plaintiff's motion is denied.

### I. BACKGROUND

#### A. Factual Background

The factual background for this case is described in detail in the Court's April 2019 Memorandum Opinion and Order denying default judgment and dismissing the case. *See Radmanesh v. Gov't of Islamic Republic of Iran*, No. 17-CV-1708 (GMH), 2019 WL 1787615 (D.D.C. Apr.

---

[1] Despite its caption, Plaintiff appears to bring a motion to alter or amend a judgment under Rule 59(e). There are two Rule 59 provisions that permit parties to bring motions: Rule 59(a), which allows motions for new trials; and Rule 59(e), which allows motions to alter or amend judgments. *See* Fed. R. Civ. P. 59. Plaintiff does not specify which provision he invokes here, but since there has been no trial in this case, the Court construes his motion as seeking relief under Rule 59(e). *See Am. Bar Ass'n v. U.S. Dep't of Educ.*, No. CV 16-2476 (TJK), 2019 WL 2211208 (D.D.C. May 22, 2019) (evaluating a Rule 59(e) motion to alter or amend a judgment following the court's grant of summary judgment), *appeal docketed*, No. 19-5213 (D.C. Cir. July 31, 2019); *cf. Kareem v. F.D.I.C.*, 811 F. Supp. 2d 279, 283 (D.D.C. 2011) (holding that a motion for a new trial under Rule 59(a) is not ripe where the case was dismissed before trial), *aff'd*, 482 F. App'x 594 (D.C. Cir. 2012).

24, 2019). The following discussion reiterates only the facts that are necessary to resolve the pending motion and to provide context for the new facts Plaintiff has introduced in conjunction with that motion. ECF No. 26. The Court will discuss allegations Plaintiff included in his complaint (ECF No. 1) and in a declaration accompanying his motion for entry of default judgment (ECF No. 21-2), as well as the new allegations Plaintiff included in a supplemental declaration attached to the present motion (ECF No. 26).

1. Plaintiff's Allegation that He Was Forced to Stay in Iran

In Plaintiff's first declaration, he alleged that he is a U.S. citizen born in Kirksville, Missouri to an American mother and an Iranian father. ECF No. 21-2 at 2. In 1978, the family moved to Isfahan, Iran where his father was employed with Polyacryl Iran, a DuPont affiliate. *Id.* In 1979, during the Iranian Revolution, Plaintiff and his family were told they would be executed as spies unless they remained in Iran and his father trained Iranian engineers. *Id.* at 3–4; ECF No. 1 at 5–6. In a supplemental declaration attached to the pending motion, Plaintiff now alleges that his family was "also placed on house arrest as a condition of [his] father's conviction." ECF No. 26 at 3, 10. Plaintiff specifies that his mother "had to inform the Iranian authorities every time [he] went to the store, walked to a friend's house, or even played in the yard." *Id.* at 3. The only activities excused from this reporting requirement were travelling to the state school Plaintiff was forced to attend and his eventual conscription into the Iranian military. *Id.* Plaintiff also notes that two and a half years of this house arrest occurred after the United States designated Iran as a state sponsor of terrorism in 1984. *Id.* at 4.

2. Plaintiff's Allegation that He Was Conscripted into the Iranian Military

Plaintiff said in his prior declaration that he was forcibly conscripted into the Iranian military at the age of sixteen to fight in the Iran-Iraq War as an Iranian solider. ECF No. 21-2 at 7.

2

Plaintiff underwent basic training and was sent on missions. *Id.* This included being sent into battle and watching children and adults be killed by landmines. *Id.* at 8. Plaintiff was also forced to shoot a sleeping Iraqi soldier "in the head at point blank range" while on a mission. *Id.* In his supplemental declaration accompanying the present motion, Plaintiff now claims he was treated differently as an American citizen serving in the Iranian military, stating "Iranian officials in the military made it clear [that American citizens] were placed in more dangerous and precarious situations because our death would serve Iran's interests as an American martyr having died fighting for Iran." ECF No. 26 at 10. He further states that punishments were harsher for American soldiers than for Iranian soldiers. *Id.* at 10. By way of example, Plaintiff explains that while an Iranian soldier who spoke out of turn or failed to follow orders "might only be responded to with a rebuke, an American soldier . . . would be killed or placed in solitary confinement." *Id.* at 10–11.

### B. Procedural History

Plaintiff filed his complaint in August 2017 under the FSIA's terrorism exception to sovereign immunity. *See* 28 U.S.C. § 1605A. Plaintiff served Iran in accordance with 28 U.S.C. § 1608(a)(4) and through diplomatic channels on October 1, 2018. ECF No. 18. Iran did not respond to Plaintiff's complaint, and at Plaintiff's request, the Clerk of the Court entered default against Iran on December 10, 2018. ECF No. 19; ECF No. 20.

Plaintiff then moved for default judgment. ECF No. 21. The Court denied the motion for default judgment and dismissed Plaintiff's complaint for want of subject matter jurisdiction. *See Radmanesh*, 2019 WL 1787615, at *11. The Court found that (1) it was unclear whether all of Defendant's actions towards Plaintiff took place after Iran's designation as a state-sponsor of terrorism, and (2) Plaintiff failed to plausibly state a claim that "an official, employee, or agent of the foreign state, while acting within the scope of his or her office, employment, or agency, . . .

3

engaged in an act of hostage-taking or torture that caused personal injury or death." *Id.* at *6–7 (quoting 28 U.S.C. § 1605A(a)(1)).

Specifically, the Court found Plaintiff's allegations that Iran had prohibited his family from leaving the country did not amount to hostage-taking because its purpose was not "to force a third party either to perform an act otherwise unplanned or to abstain from one otherwise contemplated *so as to ensure the freedom of the detainee*." *Radmanesh*, 2019 WL 1787615, at *7 (emphasis in original) (quoting *Price v. Socialist People's Libyan Arab Jamahiri*ya, 294 F.3d 82, 94 (D.C. Cir. 2002)). The Court also found that the acts prior to Plaintiff's conscription were not torture because there was no evidence Plaintiff was in the custody or control of Iran at the time the alleged abused occurred. *Id.* at *9. The alleged abuse was also not "sufficiently extreme and outrageous to warrant . . . universal condemnation." *Price*, 294 F.3d at 93–94. Finally, the Court found that Plaintiff's conscription was not torture because its purpose was for him to serve in the military, not something "'similar in nature' to those [purposes] expressly condemned by the FSIA (i.e., 'obtaining from that individual . . . information or a confession, punishing that individual for an act that individual committed or is suspected of having committed, intimidating or coercing that individual . . . or for any reason based on discrimination of any kind')." *Radmanesh*, 2019 WL 1787615, at *11 (quoting Torture Victim Protection Act, 106 Stat. 73).

Plaintiff filed the present motion on May 22, 2019. ECF No. 26. That motion is currently ripe for adjudication.

## II. LEGAL STANDARD

On a Rule 59(e) motion, "[t]he moving party carries the burden of demonstrating that relief under Rule 59(e) is warranted." *Owen-Williams v. BB & T Inv. Servs., Inc.*, 797 F. Supp. 2d 118, 124 (D.D.C. 2011). In considering a Rule 59(e) motion, a court may alter or amend a judgment

for one of three reasons: (1) an intervening change of controlling law; (2) the availability of new evidence; or (3) the need to correct a clear error or prevent manifest injustice. *See Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996). The purpose of Rule 59 is not to relitigate old issues; nor is it a vehicle for a losing party to take a "second bite at the apple." *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 247 F. Supp. 3d 76, 107 (D.D.C. 2017) (quoting *Ashraf-Hassan v. Embassy of France*, 185 F. Supp. 3d 94, 112 (D.D.C. 2016) *aff'd*, 695 F. App'x 579 (D.C. Cir. 2017)); *see also New York v. United States*, 880 F. Supp. 37, 38–39 (D.D.C. 1995) (observing that a Rule 59(e) motion is not "an opportunity to reargue facts and theories upon which a court has already ruled," and explaining that the moving party "must establish more than simply [its] continued belief that the court's decision was erroneous"). Therefore, "a losing party may not use a Rule 59 motion to raise new issues that could have been raised previously." *Kattan ex rel. Thomas v. District of Columbia*, 995 F.2d 274, 276 (D.C. Cir. 1993), *as amended* (June 30, 1993).[2]

A district court has discretion in deciding Rule 59(e) motions. *See, e.g., Ciralsky*, 355 F.3d at 673 ("A Rule 59(e) motion is discretionary and need not be granted." (quoting *Firestone*, 76 F.3d at 1208)); *Fox v. Am. Airlines, Inc.*, 389 F.3d 1291, 1296 (D.C. Cir. 2004) (stating "[a] Rule 59(e) motion is discretionary"). Motions for altering or amending a judgment are generally disfavored and courts in non-jury cases should be reluctant to set aside what they have previously decided. *See Paleteria La Michoacana*, 247 F. Supp. 3d at 92.

---

[2] Courts appear to apply materially similar standards for resolving motions brought under Rule 59 subsections (a) and (e). *Compare Ashraf–Hassan*, 185 F. Supp. 3d at 112–13 (D.D.C. 2016) (explaining that a Rule 59(a) "motion for a new trial . . . should be based upon manifest error of law or mistake of fact, and a judgment should not be set aside except for substantial reasons," including new evidence and prevention of injustice (quoting Wright & Miller, 11 *Fed. Prac. and Proc.* § 2804 (3d ed.))), *with Ciralsky v. CIA*, 355 F.3d 661, 671 (D.C. Cir. 2004) ("A Rule 59(e) motion . . . need not be granted unless . . . there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." (quoting *Firestone*, 76 F.3d at 1208)).

### III. CONCLUSIONS OF LAW

Beyond his general contention that the Court erred in denying Plaintiff's motion for default judgment, Plaintiff argues the Court should amend its judgment to account for new evidence and to correct legal errors. As to evidence, Plaintiff has submitted a supplemental declaration attesting to "new" facts, which he contends make clear that certain allegations occurred after Iran's designation as a state sponsor of terrorism. He also presents new facts that he claims undermine the Court's conclusion that Iran did not take him hostage. On the law, Plaintiff argues that the Court made the following three errors: (1) incorrectly raising a statute of limitations issue (ECF No. 26 at 1–2); (2) failing to analyze Plaintiff's alleged conscription "in the context of Iran's treatment of an American citizen merely residing in Iran" (*id.* at 2); and (3) misconstruing the law as to whether house arrest can be considered imprisonment (*id.* at 6). As explained below, the Court finds that the allegations in Plaintiff's supplemental declaration are not new evidence and that Plaintiff's legal arguments are unavailing.

#### A. New Evidence

Plaintiff presents no new evidence to demonstrate the need for a rehearing. "New evidence" under Rule 59(e) must satisfy two conditions: (a) it must be newly discovered or have been previously unavailable despite the exercise of due diligence, and (b) it must create a material dispute of fact. *See Johnson v. District of Columbia*, 266 F. Supp. 3d. 206, 211–12 (D.D.C. 2017). If evidence is not new, a court cannot consider it when deciding a Rule 59 motion. *See Kattan*, 995 F.2d at 276. This is because, as explained above, a Plaintiff may not use a Rule 59 motion to relitigate old theories and issues. *See Paleteria La Michoacana*, 247 F. Supp. 3d at 107.

Plaintiff's proffered evidence is not new. Rather, the facts alleged in his supplemental declaration were within his personal knowledge about his experience in Iran. Such facts are not

considered newly discovered or previously unavailable. *See Niedermeier v. Office of Baucus*, 153 F. Supp. 2d 23, 29 (D.D.C. 2001). This is especially true of a movant's own recollections. *See Rann v. Chao*, 209 F. Supp. 2d 75, 82 (D.D.C. 2002) (stating that the movant's sudden recollection of facts pertinent to the outcome of the case was a "transparent attempt . . . to save his case"), *aff'd*, 346 F.3d 192 (D.C. Cir. 2003); *see also Artis v. Bernanke*, 256 F.R.D. 4, 6 (D.D.C. 2009) (finding that the movant's recent recollections contradicting other evidence in the record were not new evidence because they could have been raised earlier). Accordingly, the facts alleged in Plaintiff's supplemental declaration are not new evidence under Rule 59 because they were not newly discovered or previously unavailable.[3]

**B.     Mistakes of Law**

    1.     The Court Did Not Rule on the Statute of Limitations

Plaintiff argues the Court erred by noting in a footnote a potential statute of limitations issue. *See* ECF No. 26 at 2. In the footnote, the Court observed that "Plaintiff's claims may be untimely" but also noted "[t]he Court need not address" whether it would be appropriate to raise the statute of limitations issue *sua sponte* because "it has found other grounds on which Plaintiff's claims must be dismissed." *Radmanesh*, 2019 WL 1787615, at *6 n.6. The D.C. Circuit subsequently held that a district court cannot find a plaintiff's FSIA claim untimely *sua sponte*. *See Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1112 (D.C. Cir. 2019) (holding that the statute of limitations defense under the FSIA is an affirmative defense that a court may not raise on

---

[3] Regarding Plaintiff's contention that some of the facts alleged in the supplemental declaration explain which of his allegations followed Iran's designation as a state sponsor of terror, this evidence also fails to satisfy Rule 59's materiality requirement. The Court's analysis in its previous decision proceeded expressly "on the assumption that all alleged abuse either occurred or continued to occur after Iran was designated as a state-sponsor of terrorism." *Radmanesh*, 2019 WL 1787615, at *6. Accordingly, because the Court's decision to dismiss Plaintiff's complaint did not depend on finding that any of Plaintiff's allegations predated Iran's 1984 designation, evidence purporting to refute such a finding does not create a material dispute of fact, and therefore cannot justify reconsideration under Rule 59. *See Johnson*, 266 F. Supp. 3d. at 212.

behalf of an absent defendant). Plaintiff argues that *Maalouf* should affect this Court's decision dismissing his case. ECF No. 26 at 2. Plaintiff is mistaken.

The Court's "final judgment must be 'dead wrong' to constitute clear error." *Nanko Shipping, USA v. Alcoa, Inc.*, 118 F. Supp. 3d 372, 375 (D.D.C. 2015) (quoting *Lardner v. FBI*, 875 F. Supp. 2d 49, 53 (D.D.C. 2012)). Stated another way, there must be "'a clear conviction of error' before finding a final judgment was predicated on clear error." *Lardner*, 875 F. Supp. 2d at 53 (quoting *Lightfoot v. District of Columbia*, 355 F. Supp. 2d 414, 422 (D.D.C. 2005)). Further, "to warrant reversal, the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *Sibert-Dean v. Wash. Metro. Area Transit Auth.*, 826 F. Supp. 2d 266, 272 (D.D.C. 2011) (quoting *Czekalski v. LaHood*, 589 F.3d 449, 453 (D.C. Cir. 2009)), *aff'd*, 721 F.3d 699 (D.C. Cir. 2013).

Here, the Court merely observed that there "may" be a statute of limitations issue. *Radmanesh*, 2019 WL 1787615, at *6 n.6. Noting that the authority to raise the limitations defense *sua sponte* was then an open question pending before the Circuit, the Court expressly declined to rule on the issue. *Id.* ("The Court need not address whether [raising the statute of limitations defense] would be appropriate in this case."). The Court's footnote discussing that potential issue was not an error.

2. Citizenship and Conscription

Plaintiff also argues that the Court failed (a) to analyze Plaintiff in the context of his American citizenship, and (b) to properly consider the special harm posed by the conscription of an American citizen into a foreign government's army. ECF No. 26 at 2, 5–6. These arguments fail for several reasons.

First, the Court's prior opinion did analyze Plaintiff's allegations in the context of his American citizenship. In the factual background of that decision, the Court noted that "Plaintiff was born in Kirksville, Missouri in 1969. Plaintiff's mother is American, a native of Kirksville." *Radmanesh*, 2019 WL 1787615, at *3. The Court also found that Plaintiff satisfied the second element for recovery under the FSIA, which is that "the claimant or the victim was, at the time the act . . . occurred a national of the United States." *Id.* at *6; 28 U.S.C. § 1605A(a)(2)(A)(ii)(I). This discussion makes it clear that the Court considered Plaintiff's allegations in the context of his American citizenship.

Second, Plaintiff overstates the importance his citizenship should have on the Court's analysis of whether he stated a claim for torture under the FSIA. The FSIA incorporates the Torture Victim Protection Act's definition of "torture," which is: "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering . . . whether physical or mental, is intentionally inflicted on that individual." Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992); 28 U.S.C. § 1605A(h)(7). In *Price*, the D.C. Circuit explained that courts should assess two elements in determining whether a plaintiff has stated a claim under this definition: (1) the severity of the pain and suffering intended and inflicted on the victim, and (2) the purposes for which the pain and suffering were administered. 294 F.3d at 92–93.

As the Court noted in its prior decision, to satisfy the severity prong, a plaintiff must allege conduct that is "'sufficiently extreme and outrageous to warrant . . . universal condemnation,' . . . '[t]he more intense, lasting, or heinous the agony, the more likely it is to be torture.'" *Radmanesh*, 2019 WL 1787615, at *8 (alteration in original) (quoting *Price*, 294 F.3d at 92–93). The Court observed that "all evidence in the record suggests that after Plaintiff was conscripted he was treated

like any other [soldier]: head shaved, forced to run, trained on use of weaponry and stealth tactics, transferred to a military base, sent into battle as part of an artillery unit, commanded to fight through minefields." *Id.* at *10. The Court therefore concluded that it was "not at all clear that [Plaintiff's allegations] satisfie[d] the severity requirement of *Price*." *Id.*

Plaintiff contends that the Court should have found his allegations satisfied the severity prong, arguing, "[i]t is bad enough Iran forced its own citizens to witness and participate in [atrocities]. To force a U.S. citizen to do so, against his will, is torture." ECF No. 26 at 5. However, the Court's previous decision found that, even assuming Plaintiff's allegations satisfied the *Price* test's severity prong, they still failed to state a claim for torture because they did not satisfy the purpose prong. *See Radmanesh*, 2019 WL 1787615, at *11 ("Even if forcing a child of sixteen into military battle were considered sufficiently extreme and outrageous to satisfy *Price*, it is not possible to conclude from the facts alleged that Plaintiff's wartime experience satisfies the *purpose* prong."). Plaintiff makes no substantive argument for why the Court should revisit its conclusion that he failed to satisfy the purpose prong. *See* ECF No. 26 at 5 (arguing at the end of a single sentence that Iran subjected Plaintiff and his family to the conditions they endured "for no other purpose than to intimidate and strike fear in the child and his family"). Therefore, that argument is forfeit. *See, e.g.*, *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (argument made in conclusory fashion forfeited); *Cruz v. Kelly*, 241 F. Supp. 3d 107, 113 n.4 (D.D.C. 2018) (issue raised in opening brief without support or discussion may be deemed forfeited), *appeal docketed* No. 17-5113 (D.C. Cir. May 22, 2017); *Anglers Conservation Network v. Pritzker*, 139 F. Supp. 3d 102, 116 n.10 (D.D.C. 2015) (argument not made in opening brief forfeited).

Further, it is unclear why Plaintiff believes that conscription of U.S. citizens by a foreign government is sufficiently extreme and outrageous to be considered torture. He may mean: (a)

that although conscription might not otherwise be severe enough to constitute torture if done to a country's own citizens, it can become so severe if done to noncitizens; or (b) that conscription is severe enough to constitute torture whenever it is inflicted *because* the victim is a U.S. citizen. In either case, Plaintiff's argument is unavailing.

To the extent that Plaintiff argues the experience of being conscripted by a foreign government is inherently more severe than being conscripted by one's own government, he cites no authority to support that conclusion. As with conscription writ large, Plaintiff has presented no evidence suggesting that conscription of non-citizen residents is "sufficiently extreme or outrageous to warrant . . . universal condemnation." *Price*, 294 F.3d at 92–93. Indeed, the United States requires male non-citizen permanent residents between the ages of 18 and 26 to register for the draft. *See* 50 U.S.C. § 3802(a) ("Except as otherwise provided . . . it shall be the duty of every male citizen of the United States, and every other male person residing in the United States, who . . . is between the ages of eighteen and twenty-six, to present himself for and submit to registration [for the Selective Service].").

On the other hand, if Plaintiff's argument is that conscription necessarily becomes conduct severe enough to constitute torture whenever it is undertaken because of a conscript's U.S. citizenship, that argument must also fail. For one thing, that approach to analyzing severity would collapse the two-part test announced in *Price*, folding the purpose prong into the severity analysis. *See Price*, 294 F.3d at 92–93. Moreover, adopting such an approach would mean that many, if not most, FSIA cases brought by U.S. citizens alleging torture by a foreign sovereign would be deemed sufficient because these cases frequently involve allegations of mistreatment as a result of U.S. citizenship. Plaintiff cites no authority compelling such a result. Indeed, the D.C. Circuit has indicated that, to the contrary, "torture is a label that is 'usually reserved for extreme, deliberate

and unusually cruel practices, for example, sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain.'" *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234 (D.C. Cir. 2003) (quoting *Price*, 294 F.3d at 92–93). The Circuit has given no indication that practices that are less extreme or cruel should be considered more severe when they are undertaken because of a victim's U.S. citizenship, and as explained above and in the Court's previous decision, it is not clear that Plaintiff's allegations regarding his conscription describe conduct severe enough to constitute torture. *See Radmanesh*, 2019 WL 1787615, at *8–10.

The Court declines to revisit that finding based on the Plaintiff's recently-recalled, conclusory allegations that "Iranian officials made it clear [American citizens] were placed in more dangerous and precarious situations" and that American citizens, unlike Iranians would face death or solitary confinement for "speaking out of turn" or "not strictly following orders." ECF No. 26 at 10–11. Even if these allegations constituted new evidence for purposes of a Rule 59 motion—which they do not—Plaintiff provides no explanation for how the unnamed Iranian officials "made it clear" to him that Americans would be treated differently or what "more dangerous and precarious situations" they might be subjected to. Plaintiff's sparse allegations provide "no useful details" that could "reasonably support a finding that the [conditions during Plaintiff's conscription] evinced the degree of cruelty necessary to reach a level of torture." *Price*, 294 F.3d at 93.

For all of these reasons, the Court rejects Plaintiff's invitation to reconsider its determination that he failed to state a claim of torture under the FSIA.

   3.   Hostage Taking

Citing *Ilchuk v. Att'y Gen. of the United States*, 434 F.3d 618, 623 (3d Cir. 2006), Plaintiff argues that the Court should have found he properly alleged hostage taking under the FSIA

because Iran held his family under house arrest. ECF No. 26 at 6. This curious argument is unavailing for several reasons, not least of all because the present motion is the first time Plaintiff has alleged that he was held under house arrest. As discussed above, this belated assertion is not new evidence that warrants consideration on a Rule 59 motion.

In any event, Plaintiff's new allegations do not describe conditions that rise to the level of pervasive custodial control generally contemplated by the phrases "house arrest" or "home confinement." For example, Congress recently required persons placed in "home confinement" to (a) be subject to 24-hour electronic location monitoring, and (b) remain within their residence unless they receive permission from the Bureau of Prisons to attend certain enumerated activities. First Step Act of 2018, PL 115-391, December 21, 2018, 132 Stat. 5194, 5211; *see also United States v. Fogel*, 829 F.2d 77, 80 (D.C. Cir. 1987) (describing a sentence of house arrest that permitted the defendant to leave his home only for doctor's appointments and religious ceremonies and subjected him to the "supervision of a of a probation officer who will monitor your every movement by surveillance, daily phone checks, and frequent unscheduled home visits"). Plaintiff has not alleged this level of surveillance and custodial control. He alleges only that Iran required his mother to notify government officials when he would leave his home or school to "go[] to the store, walk[] to a friend's house, or play[] outside." ECF No. 26 at 10. Although Plaintiff alleges that he was under "constant and continuous scrutiny" and was "watched by Iranian officials," this does not describe pervasive surveillance equivalent to electronic monitoring, phone checks, or unscheduled house visits. *Id.* Further, Plaintiff does not allege that he had to request permission to leave his house. Indeed, he does not allege any restrictions at all on his travel within the country. Instead, he indicates that all his mother had to do was report his whereabouts to the Iranian

government. *Id.* Satisfying such a reporting requirement hardly amounts to house arrest or detention, and it is certainly not a hostage taking.

Moreover, the out-of-circuit case Plaintiff cites has no bearing on his FSIA hostage taking claim. The petitioner in *Ilchuk* challenged the finding of the Department of Homeland Security that he was subject to removal from the United States under the Immigration Nationality Act ("INA") because he'd been convicted of an "aggravated felony." *Ilchuk*, 434 F.3d at 621. The INA defines aggravated felony to include only those theft offenses with a term of imprisonment of at least one year, and the petitioner therefore argued that his conviction for fraud of services was not an aggravated felony because he had been sentenced to home confinement with electronic monitoring rather than a prison term. *Id.* at 623. The Third Circuit rejected that argument, finding that a sentence of house arrest qualified as imprisonment under the INA. *Id.* at 623–24.

It is unclear what this has to do with Plaintiff's hostage taking claim. The FSIA's definition of hostage taking does not call for the Court to decide whether something is "imprisonment," but rather whether a defendant has "seize[ed] or detain[ed] and threaten[ed] to kill, to injure or to continue to detain another person . . . in order to compel a third party." 28 U.S.C. § 1605A(h)(2); International Convention Against the Taking of Hostages art. 1, Dec. 17, 1979, 1316 U.N.T.S. 21931. Moreover, it is worth noting that the *Ilchuk* court distinguished the INA's definition of imprisonment from that in the Federal Sentencing Guidelines, which several circuits have interpreted not to include house arrest or home detention. *Ilchuk*, 434 F.3d at 623 n.4; *see also United States v. Gordon*, 346 F.3d 135, 137–139 (5th Cir. 2003) (collecting cases and finding that the Sentencing Guidelines distinguish between imprisonment and home detention). Plaintiff explains neither why the INA's definition of imprisonment should trump that of the Sentencing Guidelines,

14

nor why either is of any utility in determining the sufficiency of his claims under the FSIA's definition of hostage taking.

Finally, Plaintiff's motion fails to address the Court's principal reason for finding his allegations of hostage taking inadequate: his failure to allege conditions for his release. In its previous decision, this Court explained that "because '[t]he definition [of hostage-taking] speaks in terms of conditions of release[,] the defendant must have detained the victim in order to compel some particular result, specifically to force a third party either to perform an act otherwise unplanned or to abstain from one otherwise contemplated *so as to ensure the freedom of the detainee*.'" *Radmanesh*, 2019 WL 1787615, at *7 (quoting *Price*, 294 F.3d at 94); *see also Simpson*, 326 F.3d at 234–35 ("The essential element of the hostage-taking claim is that the intended purpose of the detention [is] to accomplish . . . third-party compulsion . . . ."). This Court found that although Iran allegedly compelled Plaintiff's father to train Iranian engineers, this extraction of labor was "in exchange for Plaintiff's and his family's lives [and] not a *condition of Plaintiff's release* from the country." *Id.* As such, "there is no way to read [the ban on international travel] as conditioning Plaintiff's release on Iran extracting a concession (labor) from his father." *Id.* Plaintiff's allegation that his "house arrest" amounted to hostage taking fails for the same reason. He never even alleges, much less demonstrates, that his release from house arrest was conditioned on Iran's extraction of labor from his father. Rather, he alleges that the house arrest was a "condition of the father's conviction." ECF No. 26 at 3, 10. Thus, Plaintiff's argument that the Court

should reconsider its finding that his allegations failed to state a claim of hostage taking under the FSIA fails.[4]

## V. CONCLUSION

For the reasons stated above, it is hereby **ORDERED** that Plaintiff's Motion for New Trial is **DENIED**.

Date: September 3, 2019

                                                   _____
                                                   G. MICHAEL HARVEY
                                                   UNITED STATES MAGISTRATE JUDGE

---

[4] Plaintiff also asserts that "[p]rolonged house arrest for an adolescent and teenage child, when he has done nothing warranting it, is sustained, systematic abuse" and that "[t]hese undisputed facts—over many years—constitute torture." ECF No. 26 at 5. This argument appears to challenge the Court's finding that Plaintiff's allegations concerning mistreatment prior to conscription failed to make out an FSIA torture claim because he had not "provide[d] evidence that any of those acts me[t] the severity requirement established in *Price*." *Radmanesh*, 2019 WL 1787615, at *9. It relies on his assertion that he was subject to house arrest, which, for the reasons discussed above, is not new evidence meriting reconsideration under Rule 59. Moreover, Plaintiff provides no argument for why the Court should reconsider its decision regarding the torture allegations for the time prior to his conscription. Accordingly, this perfunctory argument is forfeit. *See CTS Corp.*, 759 F.3d at 64.